SUSAN KIMMELL, ADM'X, v. JOHN Q. WHEELER AND ANOTHER.

A location or file, made on the 1st of May, 1856, by virtue of a genuine certificate issued to a colonist in Peters' colony, upon land reserved from location by the Act of the 21st of December, 1853, " to provide for the construction of the Mississippi and Pacific Railroad," is illegal and void.

The party holding such certificate, and seeking to locate it within the said reservation, at that time, (May 1st, 1856,) was not protected by the 19th section of the Act of December 21st, 1853.

The provisions of the said Act of December 21st, 1853, reserving a part of Peters' colony from location, by virtue of such certificates, were constitutional, and did not violate any contract between the State and the holder of the certificates.

The holder of such a certificate had no vested right in any part of the public domain. His was a "kind of floating equity," which entitled him to appropriate vacant land, if he could find it, which it would be idle to seek to maintain against an individual grant from the State, much more against its reservation of the land for purposes of State policy.

The land outside of the reserve, as the record showed, was ample to satisfy the claim; if the claimant's right of election was narrowed by the reservation, so was that of every holder of an unlocated certificate.

The reservation of territory, created by the Act of the 10th of February, 1852, for the benefit of the plaintiff, and others having like claims, expired on the 10th of August, 1854 ; after that time, he had no priority of right over any other person entitled to appropriate vacant public land.

It is not, therefore, necessary, in this case, to decide whether the reservation of the land for colony purposes, by the Act of the 10th of February, 1852, gave the holders of colony certificates a right, until that reservation expired, to select their land in that part of the colony within the railroad reserve.

If they had the right, until after the 10th of August, 1854, the plaintiff failed to exercise his privilege, until the period had elapsed.

APPEAL from Ellis. Tried below before the Hon. Ed. H. Vontress. Suit by appellant, as administratrix of Philip Kimmell, deceased, against John Q. Wheeler, and Thomas J. Oliver, district surveyor of Robertson Land District; to try title, as against said Wheeler; and for a mandamus against said Oliver, to compel him to survey two hundred and fifty acres of land, situate in said county of Ellis, in said Robertson Land District, within the limits of Peters' colony.

The plaintiff based her title upon a location, made on the 28th day of May, 1856, by her intestate, in the office of the district surveyor of said Robertson Land District, of a certificate issued by the County Court of Colin county, for 320 acres of land, to James B. Littlepage, as a colonist in said Peters' colony, and legally transferred to Philip Kimmell, appellant's intestate.

Upon the trial, James E. Patton, a witness for appellees, testified, "that he had been a practical surveyor in the colony known "as Peters' colony, and has resided therein from 1846 to the pre-"sent time; that he is tolerably well acquainted with the limits of "Peters' colony, as recognized by the surveyors; that he was out "in a surveying expedition, in the north and west portions of said "colony territory, in A. D. 1856, locating vacant lands; that from "his knowledge of the country, and from examination of the "maps, he considers that, in 1856, there was more vacant lands in "the limits of said colony, outside of said railroad reserve, than "within it; that more of the territory of what is known as "Peters' colony, is outside of said reserve, than is within it; "and that, in 1856, there was enough vacant land to satisfy the "holders of Peters' colony certificates, outside of said reserve, "in his opinion."

On cross-examination, the witness said, "That a good deal of

"the vacant land, in 1856, in said colony, outside of said reserve, "probably the greater portion of it, was poor and worthless; that "he does not know the amount of colony certificates outstand- "ing and not located." This was all of the testimony in the record, showing the amount of vacant land outside of the railroad reservation.

*A. Bradshaw,* for appellant. We contend for appellant, that there is error in the charge of the court, in the verdict of the jury, and in the judgment of the court, in this cause, and that the same should be reversed, for the following reasons:

We hold that the contract entered into between the President of the Republic, and Peters and others, for the purpose of colonizing what is known as "Peters' Colony," was a *tripartite* contract; that the contractors, Peters and others, agreed to promote emigration within a given time, and to a specified amount, &c. That the Republic agreed to give to Peters and others, and to the colonists, lands, &c., proportioned to the number of families so introduced into the colony. That the colonist so emigrating and settling within the colony, was entitled to lands as matter of right, 640 or 320 acres, depending upon his having family or not.

A contract is an agreement for good or valuable consideration, entered into between two or more parties, able and willing to contract; and the contract here alluded to, we submit, is not only good and binding, but *indivisible.*

By the terms of this *tripartite* contract, the Republic agreed to set apart a particular section of the State, to be used exclusively for colonial purposes; and agreed to give Peters & Co. ten sections of land for the introduction and settlement of each one hundred families, as colonists. The Republic also agreed to give 640 or 320 acres of land, to each head of a family, or single man, as the case might be, emigrating to, and settling in the colony, as colonists. The colony was set apart and defined by metes and bounds, the contractors were given until July, 1848,

to introduce the number of families, that they were bound to intro-
duce under the contract. The facts show, that at the expiration
of the time, they had failed. Now the contract being indivisible,
they cannot sue the State, and recover *pro tanto* on the contract;
but it will hardly be contended, that this failure on the part of
the contractors could deprive the *colonists* of their rights to
land, they having complied with their part of the contract, by
emigration, settlement, &c. He, the colonist, is certainly en-
titled to his land, and cannot be deprived of that right, by any
failure on the part of either of the other parties to the contract,
and the legislature has no power, either to take away or impair
that right.

This right of the colonist, derived from his contract, applies
to the whole colony grant, and he has the privilege of location,
at *his option*, on any part of the vacant land within the colony
limits. (See ordinance, Hart. Dig. 85; Hart. Dig. Art. 2016, 2103,
2231, 2232, 2233.) It is said in the case of Grammar School
v. Burt, 11 Verm. 632, that "a legislative grant, to a corporation
"aggregate, vests an absolute title, without words of perpetuity,
"and the same cannot be afterwards controlled by the legisla-
"ture, any more than an absolute grant to individuals." Again,
in the case of Woodruff v. The State, 3 Pike, 285, it is said
that "contracts may be made by and with the State, as well
"as individuals, and a State may contract with its own citi-
"zens. Rights once vested, privileges once granted, or sanc-
"ioned by the laws of the State, if within the constitu-
"tional limits, may be forfeited, but cannot be arbitrarily
"divested or withdrawn by future legislation." (See Herrick v.
Randolph, 13 Verm. 525; Bank of Natchez v. The State,
6 Smedes & Marsh. 599; 6 Cranch, 137; 9 Cranch, 152; 2 Hayw.
310, 374; 4 Wheat. 641, 651; 8 Wheat, 1; 4 Gill & Johns. 1.)

The State having made the grant, and given it bounds, and
said to the colonists come, and you shall have land, as you may
choose in the colony; can the legislature afterwards limit this
privilege, or reserve any portion of the land within the limits,

from the colonists? Would not this be a breach of the franchise? If the legislature can reserve any, why not *all?*

There is a difference between the holder of a *head-right* certificate against the State, and a colonist, or the holder of a colonial certificate. The colonist has a certain district of country particularly defined, in which to make his location, and out of which he cannot go. He has his right there by *special contract.* The holder of a head-right certificate, holds under a general contract, and has no particular right to any specified district until location. Not so with the colonist; his certificate is *primâ facie* evidence of his having complied with the law, and he is entitled to locate anywhere in the colony, under a special contract; and his right cannot be abridged. Hence the railroad reservation, if it was intended to tie up land, from colonists, was a violation of the constitution. The most the legislature could do, would be, to pass laws giving the colonists a reasonable time to locate and designate their lands, after which, it might revert to the State, and become a part of the public domain : that would only affect their remedy. That never having been done, they have preference rights over all others, not colonists.

In the case of the State v. Delesdenier, 7 Tex. Rep. 76, the court said, that the holders of the Bryan scrip had no preference over any other scrip; that the holders of it had no claim to any particular portion of the public lands, but a general lien upon all the lands, &c.; that the contract was only a *quasi* contract between the government and the holder of the scrip; that the latter might select such portion of the public land as was unappropriated, and subject to location, when the same was made. In this case, it is not a *quasi,* but a special contract, giving the colonist exclusive privileges to any unappropriated land within the limits of the colony. Now, if the appellee recover in this case, so ought Delesdenier to have recovered in the case just cited. Delesdenier said the Republic had no right to reserve the islands, or any other portion of the public lands, from indiscriminate location; but the court said, they had the right to reserve the islands; and if the islands, why not any

6

other portion of the public domain? (Wilcox v. Jackson and McConnel, 13 Peters, 498.) Furthermore, it will be seen, that the colonists were entitled to hold their improvements, and that they might transfer them. (Hart Dig. Art. 229, Act 1852, p. 78, § 10.) Now, if it be contended, that the eminent domain remains in the government until patent issues, and that the legislature can control it, or appropriate it, until patent issues; if the first contract with Peters & Co., viz. the twenty miles square, had all been sectionized and settled upon, and valuable improvements made thereon, could the legislature, in 1853, appropriate the land to internal improvement purposes? We think it clear, upon the authorities cited, that they could not. The eminent domain remains in the State until patent issues, and why may not the State appropriate it? The right is acquired in the colony by settlement. Now, if the settler cannot be removed, how can the locator; or the right to locate a colony certificate, be changed? A. settles; he cannot be removed. B. comes in and settles upon the frontier, and spends his time in keeping the savage at bay; and being overpowered, he is compelled to go to the settlements, and wishes to locate his head-right alongside of A.'s, who has been enjoying the comforts of a quiet fireside at the expense of B.'s blood, treasure and time. Hard is it, that he can be driven back among the savages and A. remain, and all the south part reserved from location. The eminent domain remains in the government in A.'s case, as well as B.'s. Patent not having issued, if there were no special contract, the eminent domain would remain in the government for public or national purposes; but there being a special contract, the parties that had acquired rights under it, cannot be divested of those rights by the government, unless compensation be made to them.

And we again say, the most the legislature could do, would be to enact a law giving a certain time in which colonists must perfect their titles, after which the colony reservation should become a part of the public domain. This would only affect the *remedy*. If there were no statute of limitations, a law declaring

Kimmell v. Wheeler.

all debts of ten years standing to be barred, at the time of the passage of such law, would be void. The legislature might say, that after a specified time, *in futuro*, no suit should be brought to recover such debts. This would only affect the remedy, and would not be an *ex post facto* law.

If the contractors, Peters and others, had on the first day of July, 1848, four hundred families, which was a completion of their contract, could the legislature, on the next day, appropriate the land to internal improvements, or any other purpose? And if the legislature should undertake to do so, could not the contractors sue and recover on their contract? If the contractors could do so, certainly the colonists might. Story on the Constitution, Art. 1391, says: "If the State make a grant, it is under the protection of the constitution." In this case, the State made the grant, and the colonist accepted. Again, when the State authorizes the sale of public lands, and conveyances pass, the title cannot be revoked by the State. The repeal of a law cannot divest or annul rights acquired under such law. Land once appropriated, from that moment, is severed from the public domain, and no subsequent law, repealing or otherwise annulling or appropriating such land, is valid. (Wilcox v. Jackson, 13 Peters, 498.) From the authorities cited, it is clear, that if the Mississippi and Pacific Railroad Act was intended to lock up the reserve from location by colonists, or the holders of colonial certificates, it was unconstitutional; and the court erred in refusing to sustain appellant's objection to the law creating said railroad reserve, and to appellee's defence, based upon that law; and the court should have awarded the writ of mandamus against the surveyor.

*J. W. Berry*, also for appellant.

*J. W. Ferris*, for appellees.

WHEELER, CH. J. The only question which it is material to consider, is, whether the plaintiff's intestate was entitled to ap-

propriate the land in controversy, by his certificate, in May, 1856, when he made his application to the surveyor. And we are clearly of opinion that he was not.

The land had been reserved from location by the Act of the 21st of December, 1853, "to provide for the construction of the Mississippi and Pacific Railroad." The 14th section of the act provides "that all the vacant and unappropriated public lands belonging to the State of Texas," within certain defined limits, including the land in controversy, "be and the same is hereby held in reserve by the State," &c. (Special Laws, 5th Leg.) The only qualification annexed to this reserve, is to be found in the 19th section of the act, which provides that it "shall not be so construed, as to affect any right of location or "entry, pre-emption right or survey, heretofore acquired in the "district of country reserved and set apart for the use of said "road." (Special Laws, 5th Leg. ch. 5, p. 7, sec. 14, 19.)

The reservation created by this act remained in force until the 1st day of January, 1857; and, consequently, it was in full force and effect when the plaintiff's attempted appropriation of the land was made, in May, 1856. (Laws 6th Leg. ch. 128, p. 56.) The plaintiff's case does not come within the provision of the 19th section; and it results, that his location was contrary to law, and consequently void. The ground on which he mainly rests his right to appropriate this land, is, that the act creating the reservation is unconstitutional and void, in so far as it affects his right. The land is within the limits of Peters' colony; various acts were passed, from time to time, by the legislature, to enable the colonists to acquire a title to land. (Hart. Dig. p. 682; Laws 4th Leg. p. 72; Id. Extra Session, p. 30; 5 Id. p. 57.) The Act of 10th February, 1852, reserved the land within the limits of the colony, from general location, for the benefit of the contractors and colonists, for the period of two years and six months from its date; that is, until the 10th of August, 1854. It is contended, in effect, that by force of these acts, all the vacant land in the colony was reserved for the benefit of the plaintiff; that he had the right to locate his certificate upon

any part of it; and the broad ground is assumed, that until he had made his selection, the legislature had not the power to reserve and set apart any portion of it for a different purpose; that the reservation was a violation of the contract between him and the State.

If a pretension so extravagant be thought to require an answer, it will be found in the opinion of the court, in the case of The State v. Delesdenier; 7 Tex. Rep. 76. The plaintiff had not a vested right in any part of the public domain. He had no equitable title to any part of it. His was a kind of floating equity, which entitled him to appropriate three hundred and twenty acres of vacant and unappropriated land, if he could find so much, unappropriated, within the colony limits. It was what is called by Chief Justice Marshall, in Hoofnagle v. Anderson, 7 Wheat. 212, "a general indefinite equity, not applicable to one tract of land more than another;" a *scintilla juris*, which it would be idle to seek to maintain against an individual grant from the State; much more, against its reservation of the land for its own purposes of State policy. It cannot be doubted, that it was within the power of the legislature, to repeal the laws on which the plaintiff's right was dependent, and leave him without remedy. There is as little doubt of their power to make the reservation in question. But they did not take away his remedy; or impair the obligation of any contract between him and the State; or deny him the exercise of any right, which he had acquired under the laws enacted for his benefit. The only right he had, was that of appropriating three hundred and twenty acres, out of any land he might find vacant and unappropriated, when he came to make his selection. That right he was left free to exercise; and the record shows, that the quantity was ample, outside of the reserve. If his right of election was narrowed by the reservation, so is that of every holder of an unlocated certificate, by every appropriation of land by the certificate of another. Especially, was the right of election of the holders of head-right certificates, and other equally meritorious claims, which the holders were entitled to

have satisfied out of the vacant public domain of the State, narrowed by the reservation from general location, of the vast territory comprised within the limits of this colony, by the acts and contracts which created it, and again by the Act of the 10th of February, 1852. It would seem, that they had quite as much reason, as the appellant, to complain of a breach of contract on the part of the State.

But the reservation of the territory by the Act of the 10th of February, for the benefit of the plaintiff, and others having like claims, expired on the 10th of August, 1854. The plaintiff having failed to make his selection, had no priority of right over any other person entitled to appropriate vacant public land, and no more cause to complain of its withdrawal by the State from the general mass of land subject to location. He did not propose to make this selection, until after the expiration of the time assigned him. And it does not become necessary in this case to decide, whether the reservation of the land for colony purposes, by the Act of the 10th of February, gave the holders of colony certificates a right, until that reservation expired, to select their land in that part of the colony within the railroad reserve. If they had the right of location until the 10th of August, 1854, the plaintiff failed to exercise his privilege, until the period had elapsed. The land had then been withdrawn from the mass of vacant land out of which he was entitled to make his selection, and set apart by the State for another purpose; he could not, then, (in 1856) lawfully appropriate it by his certificate, and his location is consequently void. Our opinion of the invalidity of the plaintiff's title, renders a revision of the rulings of the court upon the defendant's points, unnecessary. The plaintiff having no right to be affected by these rulings, cannot complain of them. There is no error affecting any right of his; and as he is the only party who complains, the judgment must be affirmed.

Judgment affirmed.