Stayton, Associate Justice.
This action was brought by'the *535 •State of Texas through the Attorney General and the district attorney of the judicial district in which Greer county is embraced. The purpose of the suit is to establish the right of the State to one hundred and forty-four thousand six hundred and forty acres of land, situated in Greer county, and to cancel the patents under which the appellant asserts title to the land. The land was located and patented by virtue of land certificates issued under the act of March 15,1881 (General Laws, 35), which provided for the issuance of land certificates in favor of the surviving soldiers of the Texas revolution and others.
It is claimed by the State that the several grants under which the appellant claims are invalid, because all the land within the limits of Greer county was appropriated by the act of February 25, 1879 (General Laws, 16), to other purposes, and was, therefore, not subject to location by either of the certificates under' which the appellant claims or any other. There are many questions raised in the case, and without considering each separate assignment, these will be considered in the groups in which they are presented in the brief of counsel for appellant.
I. It is claimed that neither the Attorney General nor the district attorney, in the absence of direction so to do, from the Legislature or the executive of the State, had power to institute and maintain this action. Their right and power to maintain the suit was denied by a sworn plea, as well as by a motion asking that these officers be required to show by what authority they acted, The motion was overruled and the plea stricken out.
if either the Constitution nor the General Laws defining the powers and prescribing the duties of the Attorney General and of district attorneys, in terms, empower either of these officers to institute and maintain a suit of this character; nor do we find any law, in force at the time this suit was brought, which directed them or either of them to institute it.
Finding no express law which authorized either of those officers to institute and maintain the suit, it would be difficult to hold that either of them had the implied power resulting from the general grants of power or imposition of duties. It may be that in the exercise of the general powers conferred upon the Governor of the State, as its chief executive officer, that he would have the power to require the Attorney General to institute or to cause to be instituted a suit of this character, when, in his judgment, the welfare of the State required it, even though *536 the Legislature had not so directed; but in a government in Which the duties of all officers, as well as their powers, are defined by written law, no power ought to be exercised for which Warrant is not[there found. The plea shows that a bill introduced Bn the Senate during the sitting of the ¡Nineteenth Legislature, Which required the Attorney General to institute such suits, was ^passed by that body, but that upon reference to the judiciary committee of the House of Representatives an adverse report was made upon the bill by that committee; and from this the inference is sought to be drawn that the Legislature did not intend that the Attorney General, directly or through a district attorney, should have power to institute and maintain such a suit.
There is force in this proposition, but the failure of the Legislature to pass the bill may have resulted from the fact that the 'members of that body were of the opinion that under the general grants of power to the Attorney General he might institute-such suits without legislation expressly requiring him to do so. As the law now stands, we deem it unnecessary to determine whether the Attorney General or district attorney had power to '"institute this suit at the time ti was brought, for, be that as it 'may, by recent legislation such power is not only conferred on that officer, but its exercise in the past has been ratified and his power to maintain this suit recognized.
The act of April 1, 1887 (General Laws, page 101), after providing for the cancellation of patents issued for lands situated in ‘Greer county, located by virtue of "veteran” certificates, and 'for the issuance of certificates to the holders of such patents, declares: "that nothing in this act shall be construed as requiring or authorizing the Attorney General to -dismiss any suit now .-pending for the cancellation of said patents, nor. to prevent him ‘from bringing other suits for such purposes.” Thus we have a clear recognition, by the Legislature, of the power of the Attorney General to institute and maintain in the name, and on I behalf of, the State, this and like suits, and to institute others for the same purpose. The State doubtless has the right, by suit, (to protect-any property right vested in it, as fully as has any ¡person; and this suit was brought in its name and on its behalf, by persons claiming to act as its officers or agents.
The act to which we have referred bears conclusive evidence that the Legislature knew that this suit, or similar suits, were pending, and it must have been cognizant of all the facts attending the institution of such suits. This being true, if it be con *537 ceded that neither the Attorney General nor the district attorney was empowered to institute the suit at the time this was done, nevertheless, the State has ratified their act, and will be bound by the result as fully as though they had the power which they assumed to exercise. This ratification is retroactive, and the suit must stand as though the Attorney General and district attorney had express authority to institute and maintain it. (Story on Agency, 244-260; Wharton on Agency, 77; Ancona v. Marks, 7 H. and N., 686.)
II. It is urged that the general and special demurrers to the petition should have been sustained, and that the petition does not state a cause of action.
The main objections raised by the assignments relating to this matter are that the petition does not allege that the State was in possession of the land and ousted by the defendant, nor that the State is entitled to the possession of the land and the defendant a trespasser, and that the petition is not indorsed as the statute requires a petitition in trespass to try title to be. There was no exception based on the fact that the petition was not indorsed as the statute requires petitions to be in actions of trespass to try title; and the answer of the defendant presents defenses applicable to that character of action, thus evidencing that the defendant was not misled as to the character of the action by the want of such an indorsement. Such an objection can not be raised by a general demurrer, and when presented here for the first time can not be considered. (Bone v. Walters, 14 Texas, 527; Shannon v. Taylor, 16 Texas, 423; Wade v. Converse, 18 Texas, 234.)
The petition alleges that the lands belong to the State; that they are claimed by the defendant, and gives the origin and nature of the claim thus asserted. It prays for general relief, and that the patents under which the defendant claims be can-celled and the cloud thereby placed on the State’s title it asks to have removed. The first, second and third requirements in a petition in trespass to try title are fully complied with. The petition states facts which, if the grants through which the defendant claims are invalid, entitles the State to the possession, and that there was not an averment, in terms, that the State was so entitled, is a matter of no importance. The petition does not state that the c’efendant unlawfully entered upon and dispossessed the State of the premises, and that the defendant withholds the. possession; but there is no exception which questions *538 the sufficiency of the petition on the ground that no such averknents are made.
The eighth and ninth exceptions reach no such question. .While the statute seems to contemplate that in an action of trespass to try title such averments must bé made, it is certainly true that it is not necessary to allege any fact which it is not 'Aecessary to prove. It is not necessary to prove that the owner [of the land ever was in actual possession of it, or that the defendant was in possession, in order to sustain even an action of ¡trespass to try title; and it is therefore unnecessary to allege (these things unless some relief be sought against the defendant ’based on the fact that he has been in possession.
Under the former law it was held that a plaintiff in an action of trespass to try title must show that the defendant was in 'possession, but under the present law the action may be maintained against a defendant who never has occupied the premises if he claims title thereto. (Rev. Stats., art. 4790.)
Whether, as the petition in this case was framed, the action is to be deemed technically an action of trespass to try title, in which the respective parties would be entitled to all the statutory rights to which parties to such actions are entitled, we need not determine; for it is too clear that the petition states facts which ^empowered the court to inquire and determine whether the State was the owner of the land, as it claimed to be.
It is urged, if this be treated as a suit to remove cloud, that the petition is not sufficient, in that there is no averment that the State was in possession of the lands. The rule here invoked has doubtless been recognized by many courts exercising only an equitable jurisdiction; but it may be doubted if it can be said ever to have been a rule well established even in such tribunals.
When recognized, it was upon the ground that a court of equity would refuse to act where the party seeking equitable relief had a full and adequate remedy at law. Whatever the rule may be elsewhere, the rule invoked can have no application in the courts of this State, which are not only empowered, but required in any case, to give such relief as the facts presented may authorize or require, without reference to whether the relief be such as a court of equity or a court of law may give. In the same case legal and equitable relief may be given. (Allen v. Stephanes, 18 Texas, 659; Magee v. Chadoin, 44 Texas, 488; Grimes v. Hobson, 46 Texas, 416; Daingerfield v. Paschal, 20 Texas, 537; The State v. Snyder, 68 Texas, 687; Thompson v. Locke, 66 Texas, 383.)
*539 It is also urged that, if the patents are void, there is no necessity for relief; and, as a court will not do a useless thing, therefore it will not cancel the patents. As said by a distinguished author, this rule “leads to the strange scene, almost daily witnessed in the courts, of defendants urging that the instruments under which they claim are void, and therefore that they ought to be permitted to stand unmolested; and of judges deciding that the court can not interfere, because the deed or other instrument is void; while, from a business point of view, every intelligent person knows that the instrument is a serious injury to the plaintiff’s title, greatly depreciating its market value; and the judge himself, who thus repeats the rule, would neither buy the property while thus affected nor loan a dollar upon its security. This doctrine is, in truth, based upon mere verbal logic, rather than upon considerations of justice or expediency.” (3 Pomeroy’s Equity, 1399.)
The rale insisted upon proceeds, not upon the theory, that the court has not power to remove cloud from title by the cancellation of an instrument which evidences the adverse claim, even though it be void, but upon the the theory that the court refuses to exercise the power it has, when it clearly appears that its exercise can accomplish no useful purpose; and that, by its refusal to act, the person' who calls upon it to exercise its power will suffer no injury by its refusal to do so. If such a rale as is insisted upon can have just application in any case, it would seem to be only in a case in which, from the face of the paper, which is the basis of the claim asserted to be a cloud upon title, no man of ordinary intelligence would, in acting in relation to the subject matter of controversy, be influenced by the claim asserted to be void, for it is only in such case that injury would not result from even a void claim.
The rule thus limited would, however, be too uncertain to furnish the basis for judicial action in granting or refusing relief, and we are of the opinion that the better rule is that, notwithstanding an instrument may be void upon its face, a court has power, which it must exercise, not only to declare the instrument void, but to cancel it where a defendant asserts claim under it.
A defendant who asserts claim even under an instrument void on its face, can not be heard to say that it has not such semblance of validity as to create a cloud upon the title to property which it professes to convey, that will prejudice the right of the *540 ifeal owner if it be not removed. He can not be heard to say that others will not attach to it the same degree of faith and credit as a title bearing instrument, which he in good faith gives to it, and that, to the extent of the doubt or cloud thus cast upon the real title, its holder is injured, or is likely to be injured.
The answer of the defendant was filed before the exceptions were acted upon, and must be considered in connection with the petition in determining whether the exceptions were properly sustained.
The petition alleges that the land belongs to the State, and that the defendant claims 'them through patents issued by the Governor of the State and the Commissioner of the General Land Office, and it sets out the authority under which these officers claimed the power to pass title from the State to the patentees, and assumes that, from the facts stated, those officers had no power to issue the patents which are alleged to be void for this reason.
The defendant does not disclaim; on the contrary, relying up- ‘ on the same things alleged by the State as the basis of the power which the Governor and Commissioner assumed to exercise, it claims that those conferred the power, and that the patents are valid, and in support of their propositions they file in this court an elaborate brief, marked for careful preparation and learning. Thus standing the case, the court had the power to declare the law arising upon these facts. Such power existing, it would not be exercised for the sole purpose of declaring what the law of the case abstractly was; for this is not the purpose for which courts are created. It then became the duty of the court to determine and adjudicate the rights of the parties, and to give such relief to the party, in whose favor the adjudication was, as would protect from the injuries which it was the purpose of the suit to avoid. The statute declares that “the judgment of the court shall conform to the pleadings, the nature of the case proved, and the verdict, if any, and shall be so framed as to give the party all the relief to which he may be entitled either in law or equity” (Rev. Stats., art. 1335.)
III. Another ground of exception was, that the lands embraced within the limits of Greer county were claimed by the United States as well as the State of Texas, and that legislation looking to the settlement of the disputed question between the two governments recognized the fact that the title of the State was doubtful, and that hence the title of the State must be *541 deemed doubtful and the averment of ownership insufficient. The State, through its Legislature, has in effect, declared that Greer county is a part of the State, it has made it one of the legal subdivisions of the State; caused courts to be there held and the laws of Texas to be there administered; it levies taxes upon property there situated, and at least has attempted to appropriate every foot of land within its limits, to which private ownership had not attached before the twenty-fifth of February, 1879, to specified purposes.
So far as the courts of this State are concerned, they are bound to recognize the boundaries of the State as fixed by the Legislature, and to regard all lands within those boundaries as the property of the State, unless it be shown that the State or some former government having sovereignty within those boundaries in some way parted with the title. In no event could one claiming under the State, question its originally paramount title, so long as the proper departments of the United States and State governments do not determine that Greer county is nob within the proper boundaries of the State of Texas.
IY. It was further urged by way of demurrer that the State could not maintain this suit until the lands in Greer county “ had been surveyed or allotted for the public school fund or for the payment of the public debt.”
The boundaries of .Greer county are defined by law, and if the act of February 25, 1879, be valid and nob repealed, all lands within its boundaries unappropriated at the time that act was passed, were by it appropriated to specific purposes; and those claimed by the defendant must be held to have been embraced within the lands so declared appropriated; for the petition alleges and thé answer claims that the lands in controversy were a part of the public domain of Texas at and subsequent to March 15, 1881; the question between them being whether these parts of the public domain were unappropriated at the time those persons under whom the defendant claims located veteran certificates on them. Under these facts we see no reason why the State may not maintain this suit before, by surveys, the particular parts of Greer county are designated, which shall be applied to the one or the other of the purposes named in the act of February 35, 1879. If that act be valid and unrepealed, the land in controversy was appropriated, vested in the State, and it is a matter of no importance to the defendant whether the State holds the lands to be used to procure a fund for one or the other, *542 ¡or for both of the purposes named in the act. There is no objection made on the ground that the petition does not sufficiently describe the land.
V. It is urged that the action of the Governor and Commissioner of the General Land Office, in issuing the patents under 'which the defendant claims, is conclusive of its right, and not /reversible by any other co-ordinate branch of the State government. The acts of these officers are entitled to the highest consideration; and, if the powers which they have assumed to exercise are conferred upon them by the Constitution and laws made in accordance therewith, then their action can not be reviewed and set aside by any other department of the government, in so far, at least, as they may have exercised a power discretionary in character. If, however, they assumed to exercise a power not conferred upon them bylaw, then their acts are subject to review by the judiciary, whenever this becomes necessary to the decision of a question arising in a case of which the judiciary are /given jursdiction by the Constitution.
The power to determine what part of the public domain shall be appropriated to specific purposes, and thus be withdrawn from appropriation by individuals, except as this may be limited by the Constitution, rests with the Legislature; and neither the Governor nor the Commissioner of the General Land Office have any power to determine whether such discretionary power has been wisely exercised, nor to disregard the legislative will manifested hy a law passed in the manner prescribed by the Constitution; and, in defiance of it, to issue patents for land thus withdrawn from individual appropriation.
That the judiciary have power to inquire whether the executive department, charged with the duty of issuing patents to land, has exceeded the power conferred upon its branches, and to declare patents void when found to have been- issued without lawful power, can not be considered an open question in this court; and it matters not whether the question apises in an action in which the State or an individual calls in question the validity of aopatent.
- The case of The State v. Delesdenier (7 Texas, 75) was one in which the State called in question the validity of a patent, on the ground that the executive officers who issued it had no power to do so, the land covered by it having been appropriated to a specific purpose. In that case it was held that the State was entitled *543 to relief, and that the patent was void for want of power in the officers who issued it.
- In Sherwood v. Fleming (25 Texas Supplement), it appears that an individual had obtained a patent on land within a reservation, and in' an action between adverse claimants, the court determined the question of invalidity of the patent. After referring to the former case of Kimmell v. Wheeler (22 Texas, 77), which involved the validity of a location made within a reservation, on which, however, no patent had issued, the court thus gave the grounds on which its action was based: “Does a patent issued for lands within the reservation at that time stand upon any higher ground? It would seem, upon principle, that it does not, for the plain reason that the officer had no authority to issue patents to lands thus reserved and set apart from the mass of the public land, and the act of issuing the patent, being contrary to law, was void. It has, accordingly, been held, in numerous decisions of this and other courts, that a patent which has been issued contrary to law is void. (Mason v. Russell, 1 Texas, 731: The State v. Delesdenier, 7 Texas, 76; Stoddard v. Chambers, 3 Howard. 384: Mills v. Stoddard, 8 Howard, 345; Id., 333; 9 Crawford, 99; 18 Howard, 87.) It is too firmly settled by the whole current of judicial decisions on the point to be now questioned, that the issuance of a patent is a ministerial act, and must be performed according to law; if it is issued against law it is void. Such is the character of the defendant’s title. His location was made upon land which had been reserved from location, and which was not liable to be thus appropriated; and this was the case when the patent issued. It was, therefore, issued contrary to law, and is consequently void. It is an elementary principle not to be touched, that an act, in order to be valid, must be legal. An act which is done contrary to law must be held void.”
The following cases are to the same effect: Cowan v. Hardeman, 26 Texas, 219; Todd v. Fisher, 26 Texas, 239; Bacon v. Russell, 57 Texas, 409; Gammage v. Powell, 61 Texas, 629.
All power that any officer of this State has is given by a written law directly or indirectly, and any act which any officer, from the chief executive of the State to the lowest officer in it, may assume to do in excess of the power thus given is void; and it matters not whether the want of power results from the absence of a law confering it under any cirgumstances, or from a law which forbids the exercise of the power in a given case, *544 While the exercise of a like power in other cases would be lawful.
If the act of February 25, 1879, by which the public lands' ¡Situated in Greer county were set apart for educational purposes and for the payment of the public debt, was subject to no constitutional objection, either as to the manner of its passage “or the purpose intended to be accomplished by it, then it must be held that the lands in controversy were not subject to location and patent at the time those through whom the defendant claims thus attempted to appropriate them, unless it be true, as claimed by the defendant, that the act of March 15, 1881, repealed the act of February 25, 1879, or opened the public lands in Greer county to location by veteran certificates.
VI. It is claimed that the act of February 25, 1879, is invalid, in that it contains more than one subject, and is so titled as to express that fact. Former Constitutions of this State used the word “object” in the same connection in which the word “subject” is used in section 35, article 3 of the Constitution now in force; but the latter word, perhaps, expresses more accurately the meaning and intent of the constitutional provision. As used in the Constitution, the word “ subject ” is that which is to be dominated or controlled by the particular law. Thus considered, there can be no doubt that the subject of the act was single, and consisted of all the public land in Greer county, unappropriated at the time the act was passed; and that this subject may have been appropriated to more than one purpose or end does not affect the question.
As said in Tadlock v. Eccles, 20 Texas, 793, “the intention doubtless was to prevent embracing in an act having one ostensible object, provisions having no relevancy to that object, but really designed to effectuate other and wholly different objects, and thus to conceal and disguise the real object proposed by the provisions of an act under a false or deceptive title.” A title or act essentially single in subject, which does not thus conceal or disguise the real purpose, is not subject to constitutional objection, although the ends intended to be reached through the one subject may be many.
The decisions made under former Constitutions, in which the word “object,” which, in its ordinary signification, means more ¡-nearly the same as “end” or “purpose” than does the word “subject,” was used, are bonelusive of this question. (Giddings v. San Antonio, 47 Texas, 553; Breen v. Railroad Company, 44 *545 Texas, 302; Stone v. Brown, 54 Texas, 331; The State v. M-Cracken, 42 Texas, 384; Railroad Company v. Odum, 53 Texas, 344; Railroad Company v. Smith County, 54 Texas, 1.)
VII. It is urged that the act of February 25, 1879, is invalid for want of compliance with sections 32 and 39, article 3, of the Constitution.
It is not claimed that four-fifths of the members of each branch of the Legislature did not concur, through a vote taken as prescribed in the Constitution, in suspending the rule which requires a bill to be read on three several days in each house before it can become a law, nor that they did not so concur in declaring that an imperative public necessity existed for the suspension of the rule; but it is claimed tht this necessity is not sufficiently stated in the preamble, or in-the body of the bill. The third section of “the act declares “that an emergency and imperative public necessity exists for the immediate passage of this act; that its object may not be defeated by delay, the same shall take effect and be in force from and after its passage.” This section clearly states that an imperative public necessity for the immediate passage of the act existed, and the fact on which it determines that this was so, it declares was that delay would defeat the purpose intended to be accomplished by the act. This was declared by the Legislature to create a necessity which authorized the suspension of the rules prescribed by section 32, article 3, of the Constitution. The Constitution declares that the “necessity shall be stated in a preamble or in the body of the bill.”
If this means that the Legislature shall do more than to state that the imperative public necessity exists, and requires the facts or reasons which give rise to such necessity to be stated, of which there may be doubt, then it rests with the Legislature to determine what facts do create it, and its determination and declaration of their insufficiency must, in the nature of things, be conclusive. If the Legislature states facts or reasons, which in its judgment authorize the suspension of a rule and the immediate passage of a bill, the courts certainly have no power to re-examine that question, and to declare that the Legislature came to an erroneous conclusion.
The Legislature ascertains in its own way the facts on which it bases its action; it is made the sole judge whether facts exist to authorize the immediate passage of a bill, and whatever facts or reasons it may give for such action must be held sufficient.
*546 VIII. It is not claimed that two-thirds of all the members elected to each branch of the Legislature did not vote in the manner prescribed by the Constitution,-to give the act effect and force as a law from and after its passage; but it is claimed that the emergency which made this necessary is not sufficiently stated. We think that the third section of the act is a substantial compliance with the requirements of section 39, article 3 of the Constitution; for the same fact is stated to have created the emergency, which required the act to have the force of law from the date of its passage, that made it necessary to pass the bill without reading it on three several days in each house. If, however, this were not so, and this court had power to revise the action of the Legislature in this respect, the question would be unimportant in this case; for in any event the act would take effect ninety days after the adjournment of the Legislature, and there is no pretense that the defendant or those through whom it claims, acquired any right to the lands in controversy until long after that period had elapsed.
IX. The answer of the defendant alleged that the act of February 25, 1879, was never legally passed, in that the bill was not referred to a committee of each house before it was acted upon. The answer shows that the bill was referred to a committee by the senate, who reported upon it favorably before the senate acted upon it, but that it was not referred to a committee by the house of representatives before that body acted upon it.
The Constitution provides that “no bill shall be considered unless it has been first referred to a committee and reported thereon.” (Const., article 3, section 7.) This does not in térms require a bill to be referred to a committee by each house before it can become a law. The requirement is, that a bill shall be “referred to a committee and reported thereon,” before it shall be considered; this, from the averments of the answer, was done, and we can not, under the wording of the constitution, say that more than this was necessary. If, however, the constitution required a bill to be referred to a committee of each house, and to be reported on before the house making the reference acted on it, it would be conclusively presumed that the Legislature complied with the requirement.
It is further urged that the act of February 25, 1879, is invalid, because it originated in a bill introduced in the senate, which, it is claimed, was a bill to raise revenue. The Constitution provides that “all bills for raising revenue shall originate in the *547 house of representatives.” (Constitution, art. 3, sec. 33.) The purpose of the act was to set apart one-half of the unappropriated public domain situated in Greer county for the benefit of public free schools, and the other for the payment of the State debt, but it did not undertake.even to bring into the State treasury the proceeds of these lands. It merely withdrew that land from the body of unappropriated lands and reserved them for specific uses, leaving it to some future Legislature to determine, when and how the proceeds of these lands should be brought into the State treasury.
To hold that such a bill was one for raising revenue would require the placing on the language of the Constitution a construction which such language has never received; a strained construction, which should never be placed on language contained in a Constitution or a statute. Similar language is found in the Constitution of the United States, and, as said by Judge Story, “The history of the origin of the power already suggested abundantly proves that it has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes which may incidentally create revenue.” (Story on the Constitution, 880.) The true construction of the language used in the Constitution is given in the case of The United States v. James, 13 Blachford, 208, and any other would lead to results never contemplated.
XI. It is claimed that the Legislature had no power to reserve the public lands in Greer county for the purposes stated in act of February 25,”1879. This proposition is based on two others; first, that the Constitution made all the reservations which it was intended should be made. Second, that the Constitution made reservations and provided for the issuance of land certificates. The general rule is that the Legislature may exercise any power not denied to it by the Constitution of the State which 'is not delegated to the government of the United States, or the exercise of which is not prohibited by the Federal Constitution. The Constitution appropriated one-half of the public domain, unappropriated at the time it was adopted, for the support of public schools, and in addition to this, made other appropriations for the same purpose. (Constitution, art. 7, sec. 2.) In so far as the act in question appropriated one-half of the unappropriated land in Greer county to this purpose, it only carries into effect, in the particular territory, the mandate of the Constitution. The Constitution also appropriated, for the endow *548 ment and support of the university of Texas, lands in addition to those before that time appropriated for the same purpose, as did it appropriate lands for the purpose of erecting a State capítol (art 7, sec. 15; art. 16, sec. 57); but these, or like appropriations or reservations, but evidence the intention of the people thus to appropriate so much of the public domain absolutely, anti without reference to the will of any Legislature thereafter to assemble, and can not be held to evidence an intention to withhold from the Legislature the power to make other appropriations or reservation for public purposes. The fact that the Constitution contemplated that land certificates might be issued after its adoption, and that some were outstanding, can not be made to operate as a limitation on the power of the Legislature to appropriate or reserve lands for public purposes or uses.
When it is intended to withhold a power from the Legislature -this is done by some provision of the Constitution clearly expressing such intention. Many provisions of this character are found in the Constitution of this State, and that one which relates to the power of the Legislature to make grants of land to railway companies illustrates the view entertained by the framers of the Constitution and by the people in regard to the general powers of the Legislature to appropriate lands to specific purposes or to make reservations. The first subdivision of section 3, article 14, Constitution, provides “that there shall never be granted to any such corporation more than sixteen sections to the mile, and no reservation of any of the public domain for the purpose of satisfying such grant shall ever be made.” There we have a clear recognition of - the power of the Legislature generally to appropriate lands for public purposes, and that this power should not be exercised in the particular case, it was deemed necessary to forbid it.
The denial of the right to exercise the power in one case recognizes the existence of the power except as expressly restrained.
XII. There are several assignments of error which assert the proposition that the act of March 15, 1881, under which the certificates issued by virtue of which the lands in controversy were located and patented, repealed the act of February 25, 1879, which set apart the then unappropriated lands situated in Greer ¡•county for the purposes named in it. That the act of February 25, 1879, appropriated the land to the purposes named in it is too clear for controversy. After providing for the issuance of eer *549 tificates to the meritorious class of persons for whose benefit it was passed, the act of March 15, 1881, provides that the certificates “ may be located as headright certificates upon any of the public domain, and patented, as in other cases.”
It is claimed that the words, “upon any of the public domain,” 'evidence an intention to permit the certificates, to be issued under the act, to be located on any public lands, although appropriated to some other purpose by laws then existing. The words ‘‘ public domain” evidently were not used in their most general sense; for, if thus used, they would embrace lands owned or held by the State for public purposes, notwithstanding the Constitution had expressly appropriated some of the lands so held to specific purposes. “Domain,” in its broadest sense, when used in connection with property, means “ownership,” and “public domain” means, when used in such a connection, “public ownership.” The words were not used in this sense in the act, for it was never contemplated that the certificates might be located on any lands which the State might own and bold, or have the right to sell. The land on which the capítol is now in course of erection is in a general sense a part of the public domain, as are all the alternate sections of land heretofore located by railroad companies and appropriated to public school purposes; but it would not be contended that it was intended that any of these lands could be appropriated under certificates issued'under the act of March 15, 1881.
We are of the opinion that the words; “any of the public domain,” as used in the act, mean the same as “unappropriated public domain.” Such is the sense in which these words are used in the Constitution and laws, although in some instances the words “unappropriated” or “vacant” are used in connection with them, as will be seen by a reference to their use.
Section 2, article 7, of the Constitution, after declaring that “all the alternate sections of land reserved by the State out of grants heretofore made, or that may hereafter be made, to railroads or other corporations, of any nature whatsoever,” shall -constitute a perpetual school fund, provides, that “one-half of the public domain, of the State,” among the other funds named,
* * “shall constitute a perpetual school fund.”
The alternate sections set apart to that fund were, in a general sense, publio domain, but it was not thought that these lands would be embraced under the general terms “public domain;’” hence they were specifically appropriated, as they had been by *550 former laws, and an additional grant was made to the fund of “one-half of the public domain of the State.” The words “public domain,” as here used, meant simply that one-half of the public domain, then unappropriated to some use by the Constitution or, some precedent obligation, should be so appropriated. It makes that which in a general sense was public domain, and that which was unappropriated public domain to the named extent, with other things named, the aggregate perpetual school fund, formed from funds all of which were in a general sense public domain; some, however, already appropriated and other unappropriated, until this was done by the express declaration that “one-half of the public domain of the State * * * shall constitute a public school fund.”
Section eight, article eleven, authorizes the Legislature to aid counties and cities on the gulf coast to construct sea walls, by making donations “of such portion of the public domain as may be deemed proper.” Section fifty-seven, article sixteen of the Constitution, appropriated three million acres “of the public domain” for the purpose of erecting a State capítol; while section fifteen, article seven, of the Constitution, appropriates “one million acres of unappropriated public domain of the State,” for the endowment and maintenance of the University of Texas. Can there be any reasonable doubt that by the terms used in each of these sections, the same meaning was intended to be conveyed? There is nothing in the matter to which they severally relate to evidence an intention to give a higher or different right in the one case than in the other, or to evidence an intention that the power of the Legislature, in selecting the land to be applied to those distinct purposes, should be restricted in the one case more than in the other.
In section 6, article 14 of the Constitution, which provides for • homestead donations, the term “public land” is used in the same sense as “public domain;” and the preceding section, which provides for the forfeiture of lands granted to railway companies in case of their failure to alienate as required by law, uses the terms “vacant lands” and “vacant public domain;” but this is done to show that after forfeiture, such lands, though once severed from the public domain, should become subject to “pre-emption, location and survey,” just as though such lands had never ceased to be a part of the public domain. Without this provision there would have been doubt upon this question, *551 which it was the intention clearly to settle. (Hughes v. The State, 41 Texas, 10.)
Section 3, article 14, of the Constitution, prohibiting reservations for railways, uses the terms “any part of the public domain,” evidently intending the same thing as would be expressed by the words “unappropriated public domain.” A reservation of a thing, in favor of or for the benefit of a corporation or person, not its owner, necessarily implies that the thing to be reserved has not been appropriated and is subject to be withdrawn from general appropriation, for the benefit of the person or corporation in whose favor the reservation is made.
The second section of the same article provides that land certificates “shall be located, surveyed or patented only upon vacant and unappropriated public domain,” and not upon land “titled or equitably owned under color of title from the' sovereignty of the State.” This provision doubtless had two purposes. One was to forbid the location of land certificates on other than vacant and unappropriated public domain, and the other was to declare what, within the meaning of the section, should not be considered vacant and unappropriated public domain.
Without this Constitutional provision, in the nature of things, persons through certificates could not legally appropriate lands unless they were vacant, i. e., not legally appropriated by some other persons or not reserved or set apart for some public use. Prior to the adoption of the Constitution, however, except as it was forbidden by a few statutes applicable only to colonies named, it was lawful to locate certificates on lands which had been formally titled under such circumstances as made the grants void, and it was the purpose of the Constitution to declare that, within the meaning of the section, such lands should not be deemed a part of the vacant and unappropriated part of the public domain subject to private appropriation, by survey and patent, by virtue of certificates, notwithstanding the State may have the right to disregard or have declared invalid all such grants. Such lands within the meaning of this section of the Constitution are understood to be titled lands. (Summers v. Davis, 49 Texas, 554; Truehart v. Babcock, 51 Texas, 169.)
The section further, in effect, declares that lands located and surveyed by virtue of valid land claims or to which inchoate titles have been acquired, shall not be deemed vacant and unapr propriated public domain on account of any mere informality attending the acquisition which does not affect its legality. Such *552 lands are understood to be equitably owned before they are patented. This section of the Constitution does not undertake to legalize claims which are essentially invalid, on account of a violation of law on which they are founded; but it may have the ¡effect, in some instances, to deny the right of individuals to ¡locate, have surveyed and patented lands to which the State may have both the legal and equitable title. There is nothing in this section of the Constitution which favors the idea that the words "public domain,” as used in the Constitution in connection with, words giving the right to individuals to acquire public lands, mean more or less than the words “unappropriated public domain.”
The act of April 26, 1879, granting to indigent veterans certificates for six hundred and forty acres of land, provided, as does the act of May 15, 1881, that such certificates "may be located as headrights upon any of' the public domain and patented as in other cases.” It certainly was not intended by that act to repeal the act of February 25, 1879, or the act of February 20, 1879, which set apart the unappropriated public lands in counties named in the act for the purpose of erecting a new State capítol; for all three acts were passed at the same session. If the language did not have that effect then, why should that effect be given to its use in a subsequent statute relating to the same-matter.
By the act of July 14,1879, all the vacant and unappropriated lands in a large number of counties, as well as the unappropriated part of the Pacific reservation, and all unappropriated public lands in organized counties which as separate tracts contained not more than six hundred and forty acres, were set apart to be sold, and the proceeds applied to the same purposes to which the lands in Greer county were to be applied under the act of February 25, 1879. The act of July 14, 1879, was amended by the act of March 11,1881, but the amendment simply added the land within a county not embraced in the amended act. The act, as-thus amended, was practically repealed, in so far as it authorized the sale of the lands, by the act of January 22, 1883; but the later act recognized the fact that the original act severed the land from the unappropriated public domain and appropriated it 'to the designated purposes, and declared that nothing “contained in it should be construed to return the land reserved * * * to the mass of the public domain, but shall be construed to be reserved for the purposes for which said land was originally set *553 apart and designated by said act, until the Legislature shall otherwise provide.” The words “public domain,” as here used, evidently mean the same as the words “unappropriated public domain.”
We have here, in effect, a legislative declaration that the act of July 14, 1879, and the amendment thereto were not repealed by the act of March 15, 1881. The only difference between the act of July 14, 1879, and the act of February 25, of the same session, except that they affected different lands, was, that the first named of those acts put the lands appropriated by it upon the market for a time, while the lands appropriated by the other never were; and so, most probably, because the Legislature deemed it due to the adverse claimant of the land not to permit its appropriation by individuals, until the conflicting claims between the two governments were adjusted.
The Constitution of this State and the laws may be searched in vain for an instance in which the words “ public domain” have been used in a law bestowing a right on individuals to appropriate land, by the location of certificates, in which the context evidences an intention to confer a right to appropriate other than these unappropriated lands.
It is urged that the act of April 9, 1881, granting certificates to persons who were disabled in the military service of the State or Confederate States, evidences an intention by the Legislature to -give to the words “any public domain” a right broader than would be given to the words “unappropriated public domain.” The original bill, which became, after amendment, the act of April 9,1881, provided that the certificates to be issued under it “may Toe located as headright certificates upon any of the public domain;” but, as passed, the act provided that “the certificates granted under the provisions of this act shall be located as follows: The locator shall also locate a like amount of land for the benefit of the permanent school fund before either shall be patented, and such location shall be made on any of the public domain of Texas not reserved by law from location.” The amendment shows clearly that the Legislature was unwilling to permit the certificates provided for by this act to be located as headlight certificates, i. e., singly, and without locating a like amount of land for the benefit of the school fund, while the act under which the defendant claims did grant such a right to persons who took certificates under it. Headright certificates were not *554 any more entitled to be located on appropriated lands, than were other classes of certificates.
The fact that the act of April 9, 1881, provided that certificates issued under it should be located on public domain not reserved ,by law from location, does not affect the question; for this would be the true construction of the act had permission been given to locate on “any of the public domain,” in the absence of a clear expression of an intention to permit them to be located on lands then appropriated to other purposes. The act appropriating the public domain in Greer county, and the act through which the defendant claims, are not inconsistent. Hence the later act does not repeal the former by implication; nor can the clause in it, repealing all laws in conflict with it, have such effect. The rule is, that where the Legislature once appropriates lands to a specific purpose it ceases to be “public domain” in the sense in which these words are used in laws subsequently passed authorizing individuals to appropriate public lands, although within the more general meaning of the words, the land so appropriated may continue to be “public domain” so long as the title to' it is in the government, unless the subsequent law clearly expresses a contrary intention. As said in The State v. Delesdenier, 7 Texas, 108, “Appropriation of land by the government is nothing more nor less than setting it apart for some particular use; and whenever a tract of land shall have been legally appropriated to any other purpose, from that moment the land thus appropriated becomes severed from the mass of public domain; and no subsequent law, or proclamation, or sale would be construed to embrace it or to operate upon it, although no other reservation were made of it. The island of Galveston having been reserved from location and sale, unless special authority for that purpose was given by Congress, was, from that moment, severed from the public domain; no general repealing clause contained in subsequent laws can be held to apply to the act appropriating it to a particular purpose. Having lost the character of ‘public lands,’ it could not regain that character except by direct and express terms.” This rule has been asserted by other courts. (Railroad Company v. United States, 92 United States, 745; Spaulding v. Martin, 11 Wisconsin, 286; Newhall v. Sanger, 92 United States, 762.)
XIII. It is urged that the State is estopped and can not now assert title to the lands. This proposition is based on two others.
1. That those through whom the appellant claims had not *555 notice that the lands were appropriated, given as provided by section 2, article 14 of the Constitution.
This section can have no application to the case; for it does not apply to lands owned by the State, which, but for their appropriation for specific purposes, would be a part of its public domain, subject to- appropriation by persons holding valid claims for land. The right of the State to such lands is not evidenced by records of the general land office, records of a county, or by occupation. The purpose of its adoption was not to confer rights on holders of land certificates, but to give protection to individuals who held titled lands or lands equitably owned under color of title from the sovereignty of the soil, by forbidding the location of certificates on lands so held; and, the want of notice acquired in the manner pointed out in this section, would not protect a locator who might have notice, acquired in some other manner, that another was legally or equitably the owner of the land. There can be no question of notice in the case, for the law affects every person with notice that the State is the owner of all the land within its boundaries which has not been appropriated to individuals; besides, the laws prescribe the boundaries of Greer county, and the act of February 25, 1879, appropriates all lands within its boundaries to specific purposes, which, but for that act, might have been appropriated under certificates. If there was a question of notice in the case, neither the defendant nor those under whom it claims, can claim to have been ignorant of these laws.
2. The other ground of estoppel claimed is, that, as .the officers of the government, who have power to issue patents in proper cases, issued the patents under which the appellant claims, and construed the law as authorizing them so to do, this construction is conclusive upon the State after the land has gone into the hands of a purchaser for value. The State can not be estopped by the acts of any of its officers, done in the exercise of a power not conferred upon them, any more than it can be bound by contracts made by its officers which they were not empowered to make. The powers of all officers are defined and conferred by law, and of these, all persons who deal with them must take notice. Acts done in excess of the powers conferred, are not official acts.
The fact that executive officers of the State, in excess of their authority, had issued patents to other persons for lands similarly situated, or that they took no steps to advise or warn the appellant of the invalidity of the patents, or that the Legislature had *556 Hot passed a law requiring suits to be brought to vacate the pat'-ents, at an earlier day, can not affect the right of the State to maintain this suit. Ho one can be misled for the want of notice who has notice; and the failure of the State earlier to take steps to have the patents declared void, which the appellants must be held to have known were invalid, can not affect its right to do so at any time. That since the locations were made under which the appellant claims, the lands which were subject to location under the certificates have been exhausted, in legal methods, furnishes no reason why the appellant should be permitted to hold lands which it does not own, or why the State shall be precluded from enforcing its right to what belongs to it.
Opinion delivered June 21, 1887.
There is no error in the judgment of the district court, and it will be affirmed.

Affirmed.