

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN 11, TEXAS

JOHN BEN SHEPPERD
ATTORNEY GENERAL

August 19, 1955

Hon. J. Earl Rudder          Opinion No. S-167
Commissioner
General Land Office          Re: Effect of the amendments to
Austin, Texas                    the Veterans' Land Act as
                                 passed by the Fifty-fourth
                                 Legislature on the authority
                                 of the Commissioner of the
                                 General Land Office to admin-
                                 ister the Veterans' Land
Dear Commissioner Rudder:        Program.

Your letter requesting an opinion of this office stated as follows:

"The recent 54th Legislature amended and greatly strengthened the Veterans' Land Act when it passed H.B. 341. The amendments place certain requirements and duties upon the sellers and the appraisers of the land, provide penalties for a violation of the Act, and make certain other changes affecting the administration of the Veterans' Land Program.

"Under Article 5421m, the Veterans' Land Act, the administrative details of the Veterans' Land Program are primarily the duty of the General Land Office and its employees. Because of this, it has been the established practice of the Veterans' Land Board almost from its inception that the Commissioner of the General Land Office, the Chairman of the Board, shall have the authority to administer and supervise the functioning of the Program. In fact, we can find no indication that the Board as a whole has acted on the administrative details of the Program since a very early date, but has acted only on matters of policy and on those items on which the Constitution and Statute require full Board action.

"As the amendments to the Veterans' Land Act go into effect September 6, 1955, we would

like an opinion from your office as to
whether these amendments will make it
necessary to change this established
practice, or may the Commissioner of the
General Land Office still be vested with
the authority for administering the Vet-
erans' Land Program?"

The Veterans' Land Board and Veterans' Land Fund
were created by the provisions of Section 49b, Article III
of the Texas Constitution, adopted at an election on Novem-
ber 7, 1946. The first legislative enabling act passed in
1949. It was amended in 1951, 1953, and just recently in
1955, and is codified in the statutes as Article 5421m. The
purpose of the Veterans' Land Program is to provide a method
by which Texas veterans of military service may purchase
land from the State at a low rate of interest, with payments
spread over a long period of time.

The constitutional duties imposed upon the Board
are to issue bonds, and to expend the Veterans' Land Fund,
which is created by the issuance of these bonds, for the
purpose of purchasing land. Sec. 49b, Art. III, Tex.Const.
Article 5421m requires an official resolution by the Board
in only two general situations, which are matters relating
to the issuance of the bonds (Secs. 3 and 4), and in matters
dealing with forfeiture when the veteran purchaser defaults
in his payments. (Sec. 19). All other references in the
Act to "the Board" relate to procedural and administrative
details. The amendments passed by the recent 54th Legisla-
ture do not add to the requirements for formal action by the
Board. The substance of the amendments may be handled by
rules and regulations, or in an administrative capacity.

Section 21 of Article 5421m empowers the Board to
make and promulgate such rules and regulations as may be
necessary for the proper administration of the Veterans' Land
Act; thus, the Board also acts on matters of policy so as to
provide for the efficient administration of the Act.

The first Board meeting was in the General Land
Office on June 13, 1949, with Honorable Beauford Jester,
Governor, Honorable Price Daniel, Attorney General, and Bascom
Giles, Commissioner of the General Land Office, present. Com-
missioner Giles was elected as Chairman, and he named his Chief
Clerk, Mr. Alvis Vandygriff, as Executive Secretary of the
Board, which action was approved by a majority of the Board.
In the following months the Board adopted a resolution which

designated the Chief Clerk of the General Land Office to act as Chairman of the Veterans' Land Board in the absence of the Chairman, so that the functions of the Board could go forward without interruption. It is significant that neither of the other members was selected Chairman in the Commissioner's absence; the chairmanship was left in the General Land Office. From its very inception, therefore, the Board recognized that the Veterans' Land Program is primarily a function of the General Land Office, and throughout its history the Board has acted purely as a policy-making body with the administration of the Program being conducted by the Land Commissioner.

Such departmental construction was based upon the fact that Article 5421m reflected a legislative intent that the Land Commissioner should play a dominant role in the operation of the Program. Section 25 of the Act provides that the Executive Secretary and Assistant Executive Secretary are to be nominated by the Commissioner of the General Land Office and approved by the Board. This section further provides that all other employees of the Veterans' Land Board are to be selected by the Commissioner, and by him alone. The Act further states that all employees "shall be deemed to be the employees of the General Land Office", and civil and criminal laws regulating the conduct and relations of the employees of the General Land Office apply in every manner to the employees of the Board; all documents and papers pertaining to the Veterans' Land Program are required to be kept in the General Land Office. Penal provisions apply to documents of the Veterans' Land Board in the same manner as to documents of the General Land Office. An examination of the Departmental Appropriation Bill (Acts 1953, Ch. 81, pp. 240-243; H.B. 140, 54th Leg.), reveals that the appropriation for the Veterans' Land Board is under the broad heading of the "General Land Office," and its sub-total is added into an item called "Grand Total, General Land Office." From these facts there is a clear indication by the Legislature that the Program is to be primarily a General Land Office function.

Thus, from 1949 until December of 1954, as pointed out in the request, it was the established practice of the Veterans' Land Board that the Commissioner of the General Land Office was authorized to administer the administrative details and functions of the Veterans' Land Act. Then, on February 7, 1955, following the resignation of the former Land Commissioner and the appointment of the Honorable J. Earl Rudder as his successor, the Veterans' Land Board passed a resolution under its rule-making authority which again placed the responsibility for the operation and functioning of the Program

upon the Commissioner of the General Land Office. Matters of policy change, and those constitutional and statutory functions requiring full Board action, were excepted from the authority of the Commissioner of the General Land Office and retained by the Board.

We believe that this was a valid authorization for the following reasons:

(1) From the language and provisions of Article 5421m, it is apparent that it was the original intent of the Legislature that the Veterans' Land Program was one which could be best administered by the General Land Office;

(2) The Legislature was on notice of the departmental construction placed on the Act by the Veterans' Land Board and the Land Commissioner, and that the Commissioner was carrying out the administrative details of the Program. The Legislature amended the statute in 1951, 1953, and again in 1955, but did not change the general method of operating the Program. In fact, in 1951 the Legislature validated all actions theretofore taken by the Board, which would include authorizing the Commissioner to administer the Program; and in 1955 the Legislature refused to accept amendments to the Act which would have prevented the Board from authorizing the Commissioner to administer the Program;

(3) Those matters which have been delegated to the Commissioner are ministerial and administrative in nature.

It is believed that the Legislature originally intended the Veterans' Land Program to be administered by the Commissioner of the General Land Office for the reasons, as pointed out above, that the Commissioner was authorized to nominate the Executive Secretary and Assistant Executive Secretary of the Board; he, and he alone, was authorized to hire and fire all other employees who might work on Veterans' Land matters; these employees were designated by the Legislature as employees of the General Land Office, subject to the same civil and criminal laws regulating the conduct and relations of the employees of the General Land Office; all the papers, records, and archives of the Board were required to be deposited and kept in the General Land Office; and, finally, the appropriation for the Veterans' Land Board was included in the appropriation for the General Land Office.

As pointed out above, the only constitutional duties specifically imposed upon the Veterans' Land Board are to issue bonds and to expend the Veterans' Land Fund created by the

issuance of these bonds for the purpose of purchasing land to be sold to veterans. Art. III, Sec. 49b, Texas Constitution. The Veterans' Land Act (Art. 5421m, V.C.S.), requires a resolution by the Board only for the issuance of bonds (Secs. 3 and 4), and in matters dealing with forfeiture (Sec. 19). In no other instance does the Act, including the new amendments, spell out a requirement for formal Board action. This gives rise to the well known legal doctrine of "expressio unius est exclusio alterius" (the expression of one thing is the exclusion of the other) to the effect that as specific resolutions are required in these limited instances, formal Board action is therefore not required in any other instance.

In this respect the statute under question differs very materially from Article 5421c-3, V.C.S., which establishes and sets forth the duties of the School Land Board, composed of the same members as the Veterans' Land Board. Section 4 of that statute specifically states that "the duties of the School Land Board shall be to set all dates for the leasing and the sale of surveyed lands, and to determine prices at which any land whether surveyed or unsurveyed, shall be leased or sold, and to perform any other duties that may be imposed upon them by law. . ."; Section 6 of that statute further provides that "the School Land Board shall keep a record of its proceedings to be called its Minutes which shall include a docket on which the secretary shall enter all matters to be considered by the Board. . ."; Section 8 specifically requires that "the Minutes shall show the fact of acceptance of a bid or the rejection of a bid and the approval of the Minutes will constitute the approval of the act of acceptance or the act of refusal. . ."; Section 10 provides that "all awards or leases shall be issued by the Commissioner of the General Land Office in accordance with the Minutes as approved by the School Land Board"; Section 11 requires that "it shall be the duty of the School Land Board to advise the Commissioner in all matters submitted to it for suc. purpose"; and Section 13 gives the authority to the School Land Board to accept or refuse any and all bids. Section 14 provides that all functions, powers, rights, and duties that were vested in the old Board of Mineral Development are transferred to and vested in the School Land Board. The statute creating the Board of Mineral Development provided that no business should be "transacted by the Board except at a meeting of such Board attended by two or more members, of which meeting notice to all other members shall have been given in writing. . ., and all orders or contracts made or entered into by said Board shall only be authorized at such a meeting. . . ." (Art. 5421c, Sec. 9). The Veterans' Land Board statute,

before amendment by the 54th Legislature, did not even re-
quire that minutes be kept of meetings of the Board.

Both the statute establishing the School Land
Board and the statute creating the Veterans' Land Board au-
thorize these Boards to meet on the first and third Tues-
days of each month.  Perhaps it is because of this fact that
some confusion has arisen as to whether the Veterans' Land
Board ever actually met and transacted any business.  From
a reading of the School Land Board minutes and from the tes-
timony given by various state officials before investigat-
ing committees, it is apparent that the members went to the
meetings of the School Land Board and conducted School Land
Board business.  They were therefore available on those
days to discuss matters of Veterans' Land Board policy, and
to take action in those instances in which the statute re-
quired them to do so.  On numerous occasions they did dis-
cuss and transact business relating to the Veterans' Land
Board.  However, it is seen from the various affidavits
filed with the Veterans' Land Board that the members, al-
though they were present and on numerous occasions did act
on matters of policy, never did take any action on the ad-
ministrative and ministerial details of the Program.  This
was the responsibility of the Commissioner and the Board
proper did not act on these matters.  The affidavits do not
state that there was never a meeting of the Veterans' Land
Board, but they state that the members never considered or
acted upon these detailed matters of administration.

It is believed that if the Legislature had intend-
ed that the Veterans' Land Board should have to pass on each
application and sale, it would have specifically required a
formal resolution of such action, or that minutes be kept
and such action to be entered in the minutes of the Board, in
much the same manner as it did in the statute creating the
School Land Board.  This it did not do.

Certainly the Legislature anticipated the great num-
ber ot Texas veterans who would want to participate in the
Program.  Practical considerations show that the Legislature
could not have intended that the Board superintend every pur-
chase and sale made under the Act.  During the five and one-
half years of the operation of the Veterans' Land Program,
some 20,000 veterans' applications have been filed.  As there
are four principal steps involved in the processing of each
application, it is apparent that it would be impossible for
the Board to have passed on these more than 80,000 separate
items, particularly when the Legislature is presumed to have
known that two members of the Board, the Governor and the

Attorney General, each serve on many other State Boards and commissions in addition to the heavy duties of their own elective offices.

Thus it is recognized that the Legislature intended that the Board members be dependent upon employees of the General Land Office for matters relating to the Program. Such matters include surveying, appraisals of the property, title examination, all paper work, enforcing Board rules and regulations, receiving installment payments and, in fact, any and all of the necessary steps to process or check a veteran's purchase.

As the Veterans' Land Program was so tied to the General Land Office by the statute, it naturally follows that the Veterans' Land Board should make the Commissioner of the General Land Office responsible for the administrative details of the Program. The statute does not prohibit this action and, in fact, Section 21 of the Veterans' Land Act authorizes the Board to make and promulgate such rules and regulations as may be necessary for the proper administration of the Act. The departmental construction placed on the statute by the Board should be followed if it is reasonable. Stanford v. Butler, 142 Tex. 692, 181 S.W.2d 269 (1944). It is elementary in construing statutes that the courts must ascertain and give effect to the legislative intent, and in determining the intent the courts will look to the entire Act and not to any one phrase, clause, or article. Popham v. Patterson, 121 Tex. 615, 51 S.W.2d 680 (1932). It is believed that the departmental construction placed on Article 5421m by the Veterans' Land Board and the General Land Office appears to be a reasonable construction of the Act. The prior departmental construction will be given great weight, particularly where the Legislature has met since the adoption of the departmental construction, and has not changed the statute in this regard. The Legislature could have specifically separated the activities of the General Land Office and the Veterans' Land Board, or they could have provided separate facilities and employees for the Board, rather than making the functions of the Veterans' Land Program dependent upon the employees and facilities of the General Land Office. But, on the contrary, the Legislature has amended the Veterans' Land Act three times since the adoption of this particular departmental construction and has not altered this procedure or construction. The law presumes that the Legislature knew of the construction placed on the Act by the executive department administering the Act, and further presumes that the Legislature intended, by reenactment of the Act, that the departmental construction should continue.

Stephens County v. Hefner, 118 Tex. 397, 16 S.W.2d 804 (1929); see, also, Isbell v. Gulf Union Mutual Oil Co., 147 Tex. 6, 209 S.W.2d 762 (1948).

In addition, the Legislature, in 1951, passed a statute which specifically validated all actions theretofore taken by the Board. This had the effect of ratifying or validating the Board's action in authorizing the General Land Commissioner to be responsible for the administration of the Veterans' Land Program. Acts 1951, 52nd Leg., ch. 324, Sec. 25, p. 550; Dry Land & Cattle Co. v. State, 68 Tex. 526, 45 S.W. 865; 34 Tex.Jur. 461; 73 C.J.S. 372.

Particularly persuasive on the matter of legislative intent is the action of the recent 54th Legislature. Several amendments to the Veterans' Land Act were offered in the Legislature which would have prohibited the Veterans Land Board from authorizing the Land Commissioner to administer the Program. The texts of these amendments were as follows:

1. "No rule or regulation shall ever be promulgated which will result in the delegation of any responsibility or authority away from the members of the Board who are charged with the operation of the Board."

2. "The term 'Board' as used in this Act shall be construed for the purpose of this Act to mean all the members of the Veterans' Land Board or a majority of the members thereof."

3. "No veterans' land transaction shall ever be valid without receiving approval of all members of the Board with such approval vote by all members individually being shown in the Minutes of the Board as a permanent record of the Board."

4. "No checks shall ever be issued by the State Comptroller or any other authorized State agency in connection with or pertaining to Veterans' Land Board transfers or purchases for veterans without the Comptroller or other authorized State agencies being furnished certified copies of the Minutes showing votes of the Board's approval of such authority for expenditure in connection with veterans' land transactions."

The Legislature refused to adopt these particular amendments (H.B. 341, Acts of the 54th Leg., 1955), and thereby endorsed and gave its approval of the administrative procedure and departmental construction adopted by the Board. Certainly, this is as clear evidence as possible of the legislative intent relative to this matter.

Finally, the action of the Veterans' Land Board in authorizing the General Land Commissioner to be responsible for the operation and functioning of the administrative details of the Veterans' Land Program is valid because those matters are purely ministerial and administrative, and may be properly delegated to him by the Board. While it is a well-settled rule of law that a State board or agency may not delegate any of its authority which involves the exercise of discretion, it is equally well-settled that those matters of a purely mechanical, ministerial, administrative, or executive nature, may be properly delegated by such board or agency. Mechem, Public Offices and Officers, p. 370; Throop, Public Officers, p. 511, 540; McQuillin, Municipal Corporations, Sec. 10.41, p. 682; 67 C.J.S. 398; Attorney General's Opinions Nos. 0-5667, V-974, V-436, and V-286.

An act is none the less ministerial because the person performing it may have to satisfy himself that the state of facts exists under which it is his right and duty to perform the acts. This proposition may be illustrated by several cases. An officer authorized, upon certain conditions, to issue or revoke licenses to foreign insurance companies enabling them to transact business within a State, acts ministerially in issuing or revoking such a license, although he is required, in such case, to ascertain the existence of the facts upon which his authority is founded. State v. Doyle, 40 Wis. 174. The issuing and delivering of a patent to land, after the right thereto is complete, is a ministerial act. Simmons v. Wagner, 101 U.S. 260. County officers, in bringing a suit for the benefit of the county, and executing an injunction bond therein, act ministerially. Washington County v. Boyd, 64 Mo. 179. A District Clerk acted ministerially in approving a surety on a garnishment bond, even though he did exercise a degree of discretion when he ascertained the solvency of the surety by inquiry and examination of the county records. Benge v. Forster, et al., 47 S.W.2d 862 (1932). The act of a city in delegating authority to a committee by city ordinance to lease an opera house was only ministerial, even though the committee could lease "on such terms and conditions as they may deem expedient", as this language involves simply those ministerial acts necessary to perform the act of leasing. City of

Biddeford v. Yates, 72 Atl. 335.  A city plaster inspector
acted ministerially in passing on applications, even though
he had to ascertain that the application conformed to the
requirements of a city ordinance.  Hatz v. Linquist, 214
N.W. 260 (1927).  A city council delegated the power to a
committee to grant or revoke restaurant licenses, the test
being, "public welfare"; the court held that this was not
the delegation of a discretionary power, but instead was
only a ministerial act involving a determination of facts in
accordance with which the administration of the ordinance
would be administered.  Prawdzik v. City of Grand Rapids, 21
N.W.2d 168.  The issuance of a liquor license was minister-
ial, even though "a necessity may exist for the ascertain-
ment from personal knowledge, or by information derived from
other sources, of the state of facts on which the performance
of the act becomes a clear and specific duty /and this/ does
not operate to convert it into a /discretionary act/."
Grieder v. Tally, 77 A.L.A. 422.  The exercise of power by a
board of arbitrators to fix valuation of property was a min-
isterial act.  Allied Mortgage Co. v. Gilbert, 9 S.E.2d 913.
A decision of inspectors or judges of an election, as to the
admission of a vote; or of county canvassers as to the result
of an election; and the making of returns by election offi-
cers; are all ministerial acts.  People v. Van Slyck, 4 Cow.
(N.Y.) 297; People v. Pease, 27 N.Y. 45.  Thus, while the law
is well-settled that a discretionary act may not be delegated,
and a ministerial act may be delegated, as a matter of fact
it is often discovered that in applying these principles of
law there are many acts held to be ministerial which take in
a certain amount of the element of judgment or discretion.

Those matters of policy which require discretion
and deliberation on the part of the Board members were not
made the responsibility of the Commissioner, and the full
Board still acts on these matters.  Those matters on which the
Constitution and statute specifically require full Board ac-
tion are also still acted upon by all members of the Board.
It is those administrative and ministerial details in carrying
out the purpose of the Veterans' Land Program, which do not
require any exercise of discretion, deliberation, or judgment,
that the Commissioner has been authorized to supervise.  These
acts include processing and checking the veteran's application
to purchase, appraisals, abstract of title, commitment papers,
platting, and the contract of sale, to see that they meet the
requirements of Article 5421m and the rules and regulations
adopted by the Board as policy matters.  There are other func-
tions, such as the receipt of installment payments and the
execution of contracts and deeds, but all of these activities
are purely perfunctory and require no discretion or delibera-
tion.

We believe that the same rules will apply to the Act after the addition of the amendments as contained in H.B. 341. As pointed out above, the Legislature refused to adopt those amendments which had as their purpose restricting the Veterans' Land Board and prohibiting a delegation of the authority for administering the details of the Program. Certainly this is an indication that the Legislature knew of the procedure adopted by the Board and that by refusing to adopt these amendments, the Legislature indicated that this procedure should continue. The Commissioner may be authorized to administer those matters in the amendments that set forth additional administrative steps and details. In those instances where the amendments require a question of policy to be determined by the Board, the Commissioner may be authorized to administer that policy once it has been determined by the Board. We can find no instance in H.B. 341 that requires additional formal action by the Board in the everyday administration of the Veterans' Land Program. We are therefore of the opinion that the Commissioner of the General Land Office may still be authorized to administer the Veterans' Land Program.

Perhaps a comparison between the Veterans' Land Board and various other State agencies is in order to show how the Board differs from those agencies of which the statutes require specific action of the members of the agency, and in those instances where the statutes do not require specific action by the members of such agencies. We have already pointed out the contrast between the Veterans' Land Board and the School Land Board wherein the statute establishing the School Land Board requires specific action by the School Land Board in numerous situations, while the Veterans' Land Board is not so required by statute. Aside from the distinguishing characteristics and standards between these two Boards as set down by the Legislature and pointed out above, the very nature of the transactions involved clearly distinguish the functions and activities of these two Boards. The matters relating to the Veterans' Land Program are such that dictate daily action and adhering to closing and other time schedules in order to furnish service to veteran applicants. On the other hand, matters concerning school lands are completely different in nature, and there is no necessity for daily actions of approval or disapproval. The sale of relatively small excess acreages, the purchase of unsurveyed school lands, the lease of tidelands, and the consideration of pooling and unitization agreements are matters that can be handled on a bimonthly docket. These matters are by their very nature such that can be taken up and considered in full Board action.

The contrast between the functions of the Veterans' Land Board and the Railroad Commission is broad and apparent. The most obvious distinction between the Railroad Commission and the Veterans' Land Board is that the former is composed of members elected to perform full-time duties as Railroad Commissioners, while the members of the Veterans' Land Board obviously cannot devote their full time to any single agency of which they may be ex-officio members to the exclusion of all other duties imposed upon them by the Constitution and statutes of the State of Texas. Perhaps less obvious, but more basic, is the fact that these matters delegated to the Commissioner, wholly unlike the duties of the Railroad Commission, are such that they do not require the degree of discretion, deliberation, or judgment exerted by the Railroad Commissioners.

To illustrate this premise, it is important to note that the orders of the Railroad Commission are grounded upon many technical considerations which are brought to light by public hearings. Often the questions presented are susceptible to more than one solution; therefore, when an order of the Commission is judicially reviewed, the test is not whether the Commission reached a proper fact conclusion on the basis of conflicting evidence and conflicting theories, but whether it acted arbitrarily and without regard to the facts. As the Commission reaches its decisions on the basis of facts developed at its hearings, this action necessarily involves the exercise of deliberation and judgment.

Because of its broad and elaborate powers over all aspects of transportation and oil and gas production, the Railroad Commission must, of necessity, maintain a large staff. Its examiners hold literally thousands of public hearings each year in order to perform the myriad duties imposed upon the Commissioner. For example, in oil and gas matters the Commission must determine from evidence developed at public hearings the nature and extent of underground oil-bearing structures; reservoir pressures; the feasibility of secondary recovery programs; repressuring problems; efficient drilling methods; market demand for oil and gas; questions of waste; the protection of correlative rights; and many additional questions.

Its regulation of motor carriers requires the Railroad Commission to determine, among other things, whether the applicant for a permit to operate commercially over our highways is financially able to perform the service and is financially responsible; whether the proposed operation will promote the convenience of the public and whether it is necessary; whether the applicant's equipment conforms to established safety standards;

and whether the highways over which the applicant seeks to operate will be unduly congested or damaged by the proposed service.

Obviously, these are questions requiring the expert appraisal of a specialized body and each commissioner has the benefit of the expert counsel and judgment of his colleagues. Each commissioner might rationally entertain a different view as to what decision should be made in a particular case because of his particular technical background as a lawyer, petroleum engineer, etc.

Thus it can be seen that the decisions and rulings of the Railroad Commission are such on which there can exist differences of opinion based on different interpretations of law and fact--such decisions and rulings which require the exercise of discretion and deliberation.

Such is not the case with the matters to be considered under the Veterans' Land Act. In the first place, any Texas veteran is entitled to the benefits of the Act. There is no discretion to refuse an application so long as the applicant has complied with the provisions of the Veterans' Land Act and the rules and regulations of the Board. Next, where an appraisal is made of the land sought to be purchased, such appraisal is made by an employee of the Land Commissioner. The members of the Board cannot make a personal inspection of each tract of land requiring appraisal, and they must, therefore, accept the judgment of the appraiser, an employee of the General Land Office, as to the value of the land. The Board must also accept as correct the title opinions of the lawyers employed by the Commissioner to examine titles to the land purchased by the State. The members of the Board could not possibly examine all the abstracts to determine if the employees of the General Land Office had reached a sound conclusion as to the status of these titles. Again, this is a matter over which the Board could exercise no discretion. They must accept the judgment of the examining attorney because that is the only evidence available.

Following examination of title, the attorney has the field notes and the deed checked by Land Office draftsmen, and refers all papers to the Executive Secretary who, in conjunction with the Land Commissioner, reviews the file and obtains the warrant from the State Comptroller. The warrant and deed to the State are sent to the attorney who examined the title and he closes the sale and records the deed. The remaining functions are purely perfunctory--the receipt of installment payments and the execution of contracts and deeds to the veteran

by the Chairman of the Board, the Land Commissioner. The performance of these functions likewise requires no discretion or deliberation on the part of the Board members.

With other State boards and agencies it is a common practice for their activities to be restricted to policy-making, while a single executive administers the affairs of the Board. Examples could be multiplied, but a few should suffice:

The State Board of Public Welfare spends $125 million a year--more than is contained in the entire Veterans' Land Fund--and the actual spending of the money is an administrative matter entirely in the hands of the Executive Director and his staff.

The nine-man State Game and Fish Commission decides matters of general policy and the aministration of the Department, supervision of Game Wardens, and the expenditure of hundreds of thousands of dollars yearly is in the hands of the Executive Secretary.

The administration and enforcement of State liquor laws is handled by an Administrator and not by the State Liquor Control Board.

The Texas Aeronautics Commission is a policy-making body, but its program is administered by its Director.

There was a day when the three-man Public Safety Commission passed on every expenditure made by the Department. The Commission now establishes general policies with the administration of the State's far-flung police system and the expenditure of its funds in the hands of the Director of the Department of Public Safety.

The Hoover Commission's Task Force on the regulatory agencies stressed the need for further delegation of authority. They recommended that each commission explore more fully the possibility of further delegation to its staff of authority to handle routine and preliminary matters which should not require the specific attention of the Commission as a whole.

In the final analysis, the administration of government is based on trust. It has to be. There are physical limitations on what any one man can do; that's why staffs of employees are provided by the Legislature to handle administrative details. In the case of the Veterans' Land Board, the Land Commissioner is more than an employee. He is a State official

elected by the people, and a member and the Chairman of the Veterans' Land Board. He is the man authorized by statute to sign the deeds, to hire and to provide the employees, and to keep all Board records in his office. To him the Veterans' Land Board has delegated the authority to administer the Program. It is our opinion that such action is valid, because such was the intent of the Legislature originally; that the Legislature subsequently ratified and approved this action; and that those functions with which he is responsible are purely administrative and ministerial, and come within the general rule that ministerial acts of a State board or agency may be delegated to another.

Further, we are of the opinion that the amendments to the Veterans' Land Act as contained in H.B. 341 do not make it necessary to change this practice, and the Veterans' Land Board may continue to authorize the Commissioner of the General Land Office to administer the Program.

### SUMMARY

The amendments to Article 5421m, the Veterans' Land Act, passed by the 54th Legislature, do not make it necessary to change the established practice of administering the Veterans' Land Program, and the Commissioner of the General Land Office may still be vested with the authority for administering the Veterans' Land Program.

APPROVED:

Yours very truly,

JOHN BEN SHEPPERD
Attorney General

By
Cecil E. Burney
Special Assistant

CEB:wb