ACCEPTED
15-24-00120-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
1/21/2025 4:06 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00120-CV

# In the Court of Appeals
## for the Fifteenth Judicial District
## Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
1/21/2025 4:06:27 PM
CHRISTOPHER A. PRINE
Clerk

THE STATE OF TEXAS,

*Appellant,*

*v.*

HARRIS COUNTY, TEXAS; HARRIS COUNTY COMMISSIONERS COURT; LINA HIDALGO, IN HER OFFICIAL CAPACITY AS HARRIS COUNTY JUDGE; RODNEY ELLIS, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 1; ADRIAN GARCIA, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 2; TOM RAMSEY, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 3; LESLEY BRIONES, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF HARRIS COUNTY PRECINCT 4; HARRIS COUNTY PUBLIC HEALTH; AND LEAH BARTON, IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF HARRIS COUNTY PUBLIC HEALTH,

*Appellees.*

On Appeal from the 165th Judicial District Court, Harris County

## APPELLANT'S REPLY BRIEF

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

WILLIAM H. FARRELL
Assistant Attorney General
Texas State Bar No. 00796531
biff.farrell@oag.texas.gov
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 463-2120
Fax: (512) 320-0667

Counsel for Appellant

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Contents ....................................................................................... ii

Index of Authorities .................................................................................. iv

Introduction ................................................................................................ 1

Argument .................................................................................................... 2

   I.  The Trial Court's Temporary Injunction Order Is Properly Before this Court. ...............................................................................................2

   II.   The Attorney General Has Authority to Prevent Harris County from Violating the Texas Constitution.................................................4

     A. The Attorney General has common-law rights............................... 4

     B. Nothing has displaced the Attorney General's common-law power to bring ultra vires suits. ...................................................... 7

     C. The Attorney General did not previously advance the County's position. .................................................................................. 10

     D. The consequences of the County's argument show why it is wrong. ........ 12

   III.  The State Established Jurisdiction.................................................. 14

     A. The County entities have no immunity from equitable relief for constitutional violations. ...................................................... 14

     B. The State established traceability. .............................................. 14

   IV.  The Program Is Unconstitutional. ................................................17

     A. The Program violates the Gift Clauses. ...................................... 18

       1. The Gift Clauses apply to the Program. .................................. 18

       2. The Program violates the Gift Clauses. ................................... 22

         a. The Program is gratuitous. .............................................. 22

         b. The Program does not serve a public purpose. ................... 23

       3. Harris County does not retain constitutionally sufficient control over the funds.............................................................. 25

       4. No other constitutional provision authorizes the Program..................... 28

     B. The Program violates the Equal Protection Clause. ...................................31

   V.   The County must inform the Court whether this case or the Uplift Harris case is moot. ...................................................................... 32

**Conclusion and Prayer** ............................................................. 33

**Certificate of Compliance** ....................................................... 33

# Index of Authorities

## Cases

*13335 Duluth Rest. & Bar, L.L.C. v. Hegar*,
No. 14-20-00098-CV, 2021 WL 4314468 (Tex. App.—Houston [14th Dist.] Sept. 23, 2021, no pet.) ............................................................................... 18

*Abbott v. Harris County*,
672 S.W.3d 1 (Tex. 2023)........................................................................... 12

*American Nat'l Ins. Co. v. Acre*,
672 S.W.3d 347 (Tex. 2023)......................................................................... 5

*Bexar County v. Linden,*
220 S.W. 761 (Tex. 1920) ……………………………………………… 29

*Bonsmara Nat. Beef Co, LLC v. Hart of Tex. Cattle Feeders, LLC,*
603 S.W.3d 385 (Tex. 2020) ........................................................................ 2

*Borgelt v. Austin Firefighters Ass'n,*
692 S.W.3d, 288 (Tex. 2024)............................................................... passim

*Butnaru v. Ford Motor Co.,*
84 S.W.3d 198 (Tex. 2002) .......................................................................... 4

*Byrd v. City of Dallas*,
6 S.W.2d 738 (Tex. [Comm'n Op.] 1928)................................................. 20

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) .......................................................................13

*City of Elsa v. M.A.L.*,
226 S.W.3d 390 (Tex. 2007) ..................................................................... 14

*City of Galveston v. State,*
217 S.W.3d 466 (Tex. 2007)......................................................................... 9

*Collingsworth County v. Allred,*
40 S.W.2d 13 (Tex. 1931) ........................................................... 19, 20, 28

*Crawford Chevrolet, Inc. v. McLarty,*
519 S.W.2d 656 (Tex. App.—Amarillo 1975, no writ) .............................31

*Day Land & Cattle Co. v. State,*
4 S.W. 865 (Tex. 1887)............................................................................ 9, 10

*El Paso Electric Company v. Texas Department of Insurance,*
937 S.W.2d  (Tex. 1996)............................................................................... 9

*Fraley v. Tex. A&M Univ. Sys.,*
664 S.W.3d 91 (Tex. 2023).........................................................................17

*Heckman v. Williamson County,*
369 S.W.3d 137 (Tex. 2012) ......................................................................15

*Herbert v. Hopkins*,
  395 S.W.3d 884 (Tex. App.—Austin 2013, no pet.) ............................................31

*Hernandez v. Ebrom*,
  289 S.W.3d 316 (Tex. 2009) ........................................................................ 2, 3

*In re Abbott*,
  645 S.W.3d 276 (Tex. 2022) ...............................................................................15

*In re State,*
  No. 24-0325, 2024 WL 2983176 (Tex. 2024)............................................16, 29, 30

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986) ....................................................................................... 4

*Marino v. Lenoir*,
  526 S.W.3d 403 (Tex. 2017) ............................................................................. 5

*Mid-Century Ins. Co. of Tex. v. Kidd*,
  997 S.W.2d 265 (Tex. 1999) ............................................................................. 8

*Molinet v. Kimbrell*,
  356 S.W.3d 407 (Tex. 2011) .........................................................................8, 13

*Patel v. Tex. Dept. of Licensing & Regulation*,
  469 S.W.3d 69 (Tex. 2015) ............................................................................. 14

*Rattray v. City of Brownsville,*
  662 S.W.3d 860 (Tex. 2023) ........................................................................... 33

*Richards v. Mena*,
  820 S.W.2d 372 (Tex. 1991) ............................................................................. 3

*Smith v. State,*
  328 S.W.2d 294 (Tex. 1959).........................................................................8, 11

*Spence v. Fenchler,*
  180 S.W. 597 (Tex. 1915) ............................................................................... 29

*Spradlin v. Jim Walter Homes, Inc.*,
  34 S.W.3d 578 (Tex. 2000) ............................................................................. 21

*State v. Hollins,*
  620 S.W.3d 400 (Tex. 2020) ..................................................................... passim

*State v. Naylor,*
  466 S.W.3d 783 (Tex. 2015) ............................................................................. 4

*Taylor v. Tolbert*,
  644 S.W.3d 637 (Tex. 2022) ........................................................................ 5, 8

*Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*,
  74 S.W.3d 377 (Tex. 2002) .....................................................................20, 22, 29

*Texas Ass'n of Bus. v. City of Austin,*
  565 S.W.3d 425 (Tex. App.--Austin 2018, pet. denied) ......................................15

*WCJ Assets, Ltd. v. US Trinity Bridgeport, LLC*,
   No. 02-23-00056-CV, 2023 WL 4115398 (Tex. App.—Fort Worth June 22,
   2023, no pet.) ................................................................................................. 3
*Webster v. Comm'n for Law. Discipline*,
   No. 23-0694, 2024 WL 5249494 (Tex. Sept. 12, 2024) ................................. 1, 6
*Yett v. Cook*,
   281 S.W. 837 (Tex. 1926) ................................................................................. 4

**Statutes**

42 U.S.C. § 803(c)(1) ............................................................................................ 32
Tex. Const. art IV, § 22 ......................................................................................... 7
Tex. Const. art. I, § 3 ............................................................................................ 31
Tex. Const. art. III, § 51-1 .................................................................................... 24
Tex. Const. art. III, § 52(a) ............................................................................. 21, 22
Tex. Const. art. III, § 52-a ................................................................................. 1, 30
Tex. Local Gov't Code § 262.007 ........................................................................ 13

**Rules**

Tex. R. Civ. P. 683 ............................................................................................... 16

**Other Authorities**

*Tex. Att'y Gen. Op. JM 1255* (1990) .................................................................... 24
*Tex. Att'y Gen. Op. No. MW-89* (1979) ............................................................... 25
*Tex. Att'y Gen. Op. No. MW-89*(1979) ................................................................ 25
Tex. H.J. Res. 7 .................................................................................................... 24
Tex. H.J. Res. 34 .................................................................................................. 19
Tex. H.J. Res. 62 .................................................................................................. 19

## INTRODUCTION

As the "chief law officer of the [State]," the Attorney General, who has "broad discretionary power [to] carry[] out his responsibility to the State," is authorized to ensure municipal corporations within the State don't transgress the bounds of the Texas Constitution. *Webster v. Comm'n for Law. Discipline,* No. 23-0694, 2024 WL 5249494, at *11-12 (Tex. Sept. 12, 2024). Same here. On behalf of the State of Texas, the Attorney General brought claims against Harris County and its various officials for violating the Gift Clauses of the Texas Constitution when the County approved the Harris County Community Prosperity Program (the Program). The Texas Supreme Court, relying upon constitutional and statutory authority, has long recognized the Attorney General's ability to enforce the State's laws by filing ultra vires lawsuits against local officials who defy those laws. Further, the State has met standing's traceability requirement because the Harris County Commissioners Court approved the Program, the Harris County Judge executed the Program contracts, and the Executive Director of Harris County Public Health is responsible for designing and implementing the Program.

And the County has acted ultra vires. The Program does not satisfy the Gift Clauses, and no other constitutional provision—including the economic-development provision, Tex. Const. art. III, § 52-a—authorizes it. The

1

Program also violates the state equal-protection guarantee. The Court should reverse the trial court's judgment and enjoin the County from issuing Program payments.

## ARGUMENT

### I. The Trial Court's Temporary Injunction Order Is Properly Before this Court.

"When a trial court renders a final judgment, the court's interlocutory orders merge into the judgment and may be challenged by appealing that judgment." *Bonsmara Nat. Beef Co, LLC v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 390 (Tex. 2020). Harris County incorrectly contends that the trial court's final judgment mooted the temporary injunction order such that this Court should not review it. Appellee.Br.15-16. But the County takes the cases it cites out of context. The entry of a final judgment with a *permanent injunction* may moot a temporary-injunction order, and a pre-existing temporary-injunction *appeal* may become moot when final judgment is entered, but that's not what happened here. In *Bonsmara*, the Texas Supreme Court explained that "appeals of some interlocutory orders—such as temporary injunctions—become moot because the orders have been rendered moot by subsequent orders." *Bonsmara*, 603 S.W.3d at 395 (citing *Hernandez v. Ebrom,* 289 S.W.3d 316, 319 (Tex. 2009)). But in that discussion, the Court was referencing cases in which the entry of a permanent injunction mooted

2

the appeal of a temporary-injunction order. *See Hernandez*, 289 S.W.3d at 319 ("[T]he appeal of a temporary injunction was rendered moot by the rendering of a permanent injunction."); *Richards v. Mena*, 820 S.W.2d 372 (Tex. 1991) ("[T]he district court has now rendered a final judgment in the permanent injunction sought in this cause. Consideration of the temporary injunction is therefore moot."); *WCJ Assets, Ltd. v. US Trinity Bridgeport, LLC*, No. 02-23-00056-CV, 2023 WL 4115398, at *11 (Tex. App.—Fort Worth June 22, 2023, no pet.) ("In this case, the temporary injunction and the summary judgment (which includes a permanent injunction) address the same parties, same issues, and same property. Accordingly, because the interlocutory appeal is now moot, we dismiss the appeal of the temporary injunction."); *see id.* at *11 ("For example, a final judgment granting a permanent injunction typically moots a pending interlocutory appeal from a prior order granting a temporary injunction.").

The County's argument is also nonsensical. On its view, if a trial court denies a temporary injunction and grants a plea to the jurisdiction, which operates as a final judgment, then an appellate court could not reverse the grant of the plea to the jurisdiction, order the trial court to issue a temporary injunction, and remand for further proceedings with a temporary injunction in place pending trial. Perhaps that is the relief that the County desires if it loses this appeal, such that it could make

3

payments even if it loses. Response to Appellees' Motion to Vacate 4-5, *Texas v. Harris County,* No. 15-24-00120 (Tex. App.—15th Dist. Jan. 21, 2025). But that is not the law. In any event, the County has failed to offer argument defending the trial court's decision to deny the temporary injunction. While it has argued the merits, it has now abandoned its arguments as to the other temporary-injunction factors by failing to brief them. *See Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002).

## II. The Attorney General Has Authority to Prevent Harris County from Violating the Texas Constitution.

Since at least 1926, the Supreme Court has "recognized the State's 'justiciable interest in its sovereign capacity in the maintenance and operation of its municipal corporations in accordance with law.'" *State v. Hollins,* 620 S.W.3d 400, 410 (Tex. 2020) (citing *Yett v. Cook,* 281 S.W. 837, 842 (Tex. 1926)). "That view has endured." *Id.* The Supreme Court has also recognized that "the State has an intrinsic right to . . . enforce its own laws." *State v. Naylor,* 466 S.W.3d 783, 790 (Tex. 2015). And when, as here, local officials are defying state law, "an *ultra vires* suit is a tool 'to reassert the control of the state." *Hollins,* 620 S.W.3d at 410.

### A. The Attorney General has common-law rights.

Harris County's argument starts from the wrong premise. It contends that the Attorney General has no power to act unless a statute or the Constitution expressly authorizes him to do so, as if he were a federal agency created by statute. *See La. Pub.*

*Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). But that gets the analysis backwards. Properly framed, the question is whether the Constitution or the Legislature have *displaced* the Attorney General's common-law rights: here, the power to bring a common-law ultra vires action. Neither the Constitution nor the Legislature have done so.

The Texas Supreme Court "construe[s] statutory language against the backdrop of common law, assuming the Legislature is familiar with common-law traditions and principles." *Marino v. Lenoir*, 526 S.W.3d 403, 409 (Tex. 2017). Because the State adopted the common law, Courts "follow an opt-out approach that incorporates common-law principles absent the Legislature's clear repudiation." *Taylor v. Tolbert*, 644 S.W.3d 637, 650 (Tex. 2022). Courts do *not* follow an "opt into" approach that requires the Legislature to enact every part of the common law. *Id.* "This principle applies to all positive law—not just statutes, but constitutional texts, too." *American Nat'l Ins. Co. v. Acre*, 672 S.W.3d 347, 365 (Tex. 2023) (Young, J., concurring). Given "this State's rich common-law history, law is seldom written on a blank slate." *Id.* (citation omitted). In other words, to determine the Attorney General's powers, constitutional and statutory interpretation begins from the premise that the Attorney General has common-law rights, and the Court

must ascertain whether the Constitution or the Legislature have clearly repudiated them.

The "office of the attorney general is one of ancient origin." *Webster*, 2024 WL 5249494, at *11. "Like the common-law attorney general, the Texas attorney general is the chief legal officer of the State." *Id.* The Office of the Attorney General "preexisted our statehood and was incorporated into our first constitution." *Id.* And though "[t]he Attorney General can only act within the limits of the Texas Constitution and statutes," *id.*, the question is whether any those limits displaced the Attorney General's power to bring a common-law ultra vires claim. They have not.

*Hollins* compels the conclusion that no positive law has displaced the power of the Attorney General to bring an ultra vires suit. In that case, the Attorney General, representing the State, brought a common-law ultra vires suit against a Harris County official. *Hollins*, 620 S.W.3d at 405. There, the Court held that "ultra vires conduct automatically results in harm to the sovereign as a matter of law" and explained that "as a sovereign entity, the State has an intrinsic right to…enforce its own laws." *Id.* at 410. When laws are "being defied or misapplied by a local official, an ultra vires suit is a tool to reassert the control of the state." *Id.* "The sovereign would be impotent to enforce its own laws if it could not temporarily enjoin those

breaking them pending trial," *id.*, just as the State attempted to do here. CR.7. In short, *Hollins* recognized the Attorney General's common-law right to bring ultra vires suits against local government entities.

### B. Nothing has displaced the Attorney General's common-law power to bring ultra vires suits.

Harris County's various authorities do not provide a "reject[ion]," Appellee.Br.24, of this common-law right. Nor could they, given the recency of *Hollins.* The County points to the Attorney General's power to "represent the State in all suits and pleas in the Supreme Court of the State in which the State may be a party," and to "perform such other duties as may be required by law." Tex. Const. art IV, § 22, purporting to contrast that power with another provision explaining that county attorneys "shall represent the State in all cases in the district and inferior courts in their respective counties," *id.* art. V, § 21. But those two provisions do not stand for the proposition that the Attorney General may not represent the State in trial courts using common-law actions for at least three reasons. *First*, as the County acknowledges, the Legislature may provide the Attorney General with additional authority to represent the State in trial court, such that "all cases" does not literally mean that. Appellee.Br.19. *Second*, the County implicitly relies on the *expressio unius* canon to suggest that, absent legislation, the Attorney General may not bring any cases in trial courts. But *expressio unius* is "not an absolute rule" and "should not be

7

mechanically applied to compel an unreasonable interpretation." *Mid-Century Ins. Co. of Tex. v. Kidd*, 997 S.W.2d 265, 274 (Tex. 1999). *Third*, the County's interpretation of the constitutional provisions it cites would lead to "absurd or nonsensical results." *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). If the Attorney General has no common-law rights to bring ultra vires claims against counties, then every time any county in Texas commits an obviously ultra vires act, the only remedy would be for the county to sue itself.

That the Legislature may create new causes of action and authorize the Attorney General to bring them says nothing about common-law causes of action. Indeed, "when the Legislature creates a new or additional cause of action in favor of the State, it may also constitutionally authorize the Attorney General to prosecute such a cause of action in both the trial and appellate courts of the State." *Smith v. State*, 328 S.W.2d 294, 294 (Tex. 1959). But that simply means that the Legislature may determine who may bring legislatively created causes of action. But if the Legislature wishes to displace the common law, it must do so with "clear repudiation." *Taylor*, 644 S.W.3d at 650.

Other cases that the County cites are similarly off-point. *El Paso Electric Company v. Texas Department of Insurance* simply explains that while "there is no statute authorizing the Attorney General to represent the State and its agencies in

district court, the Legislature has provided for such representation in particular types of cases." 937 S.W.2d 438 (Tex. 1996). That says nothing about common-law causes of action or whether the Legislature has displaced them; much less does it "express[ly] reject[]" the Attorney General's common-law authority. *Contra* Appellee.Br.21. Nor does *City of Galveston v. State* address the issue. That case involved whether a city retained governmental immunity when the State attempted to sue it for monetary damages, and the Court explained that no statute had waived the City's immunity. 217 S.W.3d 466, 470 (Tex. 2007). Nor was *City of Galveston* an ultra vires case (after all, the ultra vires doctrine operates as an exception to immunity), unlike *Hollins*, which was.

*Day Land and Cattle* is of no help to the County. At the very least, that case did not decide the issue the County claims it did, and at most, it shows that the Attorney General has common-law rights. In that case, the Attorney General brought a common-law trespass-to-try-title action to "establish the right of the [S]tate" to certain land and "cancel the patents under which appellant asserts title to the land." *Day Land & Cattle Co. v. State*, 4 S.W. 865, 866 (Tex. 1887). While the Court discussed whether the Attorney General had the power to bring the suit absent a statute, the Court ultimately "deem[ed] it unnecessary" to decide the issue because "by recent legislation such power is not only conferred on that officer, but

its exercise in the past has been ratified, and his power to maintain this suit recognized." *Id.* So, because the Legislature passed a statute, the Court did not decide the issue.

But that statute is well worth examining too. It said that "nothing in this act shall be construed as requiring or authorizing the attorney general to dismiss any suit now pending for the cancellation of said patents, nor to prevent him from bringing suits for such purposes." *Id.* Notably, that statute does not *affirmatively grant* authority to bring common-law trespass-to-try-title actions in the State's name; instead, it states that the common law had not been displaced. That makes sense, as the Legislature did not need to give the Attorney General the right to bring the common-law action. *See supra* 8.

The County's discussion of the removal of a constitutional provision requiring the Attorney General to superintend and direct the actions of district attorneys is similarly irrelevant. That such a provision was removed from the Constitution says nothing about the Attorney General's own common-law rights. *Contra* Appellee.Br.26-28.

### C. The Attorney General did not previously advance the County's position.

The County selectively quotes a brief that the Attorney General filed in *Paxton v. Longoria* and suggests that that that brief advanced the County's position. *See* Br.

for Atty. Gen. of Tex., No. 22-0224 (Tex. Apr. 7, 2022). The County takes that brief out of context. That brief addressed a certified question about whether the Attorney General could enforce civil penalties in the Texas Election Code. *Id.* at xiii. It explained that when the Legislature creates causes of action, the Attorney General must have some positive law, express or implied, to use them. The Attorney General wrote "It is clear that when the Legislature creates a new or additional cause of action in favor of the State it may also constitutionally authorize the Attorney General to prosecute such cause of action in both the trial and appellate courts of the State." *Id.* at 39 (quoting *Smith*, 328 S.W.2d at 295). The Attorney General then explained that the Texas Supreme Court has "generally required a clear statement that expressly authorized the Attorney General, as well as any District or County Attorney, to institute and prosecute the *statutory suit* thus created." *Id.* at 39 (emphasis added). And he further explained that "it may be possible that the overall statutory context will permit the Attorney General to bring suit without express authorization." *Id.* These arguments arose in the context of whether the Attorney General could enforce civil penalties that a statute authorized. *Id.* at xiii.

By sharp contrast, this case, like *Hollins*, is a common-law ultra vires suit against Harris County officials. The Attorney General's *Longoria* brief expressly explained that the Attorney General could enforce Texas election laws through an

ultra vires action. *Id.* at 42-43. It pointed out that the Election Code provision at issue there "preserved pre-existing remedies" and "this preservation of remedies was made in the context of this Court's decision in *Hollins*, which allowed the Attorney General to use an ultra vires action to rein in election officials who intended to violate the law." *Id.* at 43. The State has not contradicted itself, and *Hollins* governs this case. The State did not concede in 2022 that it could not have brought *Hollins* against Harris County in 2020.

### D. The consequences of the County's argument show why it is wrong.

If the County is correct that the Attorney General has no power to bring common-law causes of action absent positive law, then neither does the County. Counties "possess only such powers and privileges as have been expressly or impliedly conferred upon them." *Hollins*, 620 S.W.3d at 406. Thus, if the Attorney General has no common-law rights absent positive law, then the County doesn't, either. Most relevantly, that would mean that the County has no power to bring common-law ultra vires actions in the County's name against state officials, as it has repeatedly (and recently) done. *See e.g. Abbott v. Harris County*, 672 S.W.3d 1, 6-7 & n.20 (Tex. 2023). Similarly, no county attorney's office would have the power to bring any common-law cause of action, such as a breach-of-contract claim or any tort claim, in the County's name unless it could point to a source of positive law. For

12

example, while the County may bring claims for breach of a written contract for engineering, architectural, or construction services or for goods related thereto under Tex. Local Gov't Code § 262.007, accepting the County's arguments would necessarily mean the County would be prohibited from bringing claims for any *other* type of breach of contract. The County surely does not intend these results.

Similarly, the Attorney General would also have no common-law rights. Under the County's theory, the Attorney General could never bring an ultra vires suit against any county. In that world, if a county committed an obviously ultra vires act, the only remedy would be for the county attorney to sue his own clients. The State doubts that the County is volunteering for that. Moreover, such a state of affairs contradicts *Hollins* because the "sovereign would be impotent to enforce its own laws." 620 S.W.3d at 410. The County's arguments would also suggest that the Attorney General could never bring a contract or tort claim absent a statute. They would also mean that the Attorney General has *fewer* common-law rights than ordinary citizens, given that the ultra vires cause of action is available to private citizens just like other common law claims. *See, e.g., City of El Paso v. Heinrich*, 284 S.W.3d 366, 377-78 (Tex. 2009). These "absurd or nonsensical results*,*" *Molinet*, 356 S.W.3d at 411, show why the County is wrong.

## III. The State Established Jurisdiction

The State properly sought to enjoin the County and its respective officials from violating the Texas Constitution.

### A. The County entities have no immunity from equitable relief for constitutional violations.

*City of Elsa v. M.A.L.* explained that "suits for injunctive relief may be maintained against governmental entities to remedy violations of the Texas Constitution." 226 S.W.3d 390, 392 (Tex. 2007). For that reason, the State properly sued the county entities for violations of the Gift Clauses. In response, the County offers only a footnote conclusorily asserting that *City of Elsa* is no longer good law in light of *Patel*. Appellee.Br.32 n.9. That is wrong. In *Patel,* the Supreme Court specifically indicated it was not departing from its earlier decision in *City of Elsa*, holding that the "appeals court did not err by refusing to dismiss the plaintiffs' claims [against the city] for injunctive relief on alleged constitutional violations." *Patel v. Tex. Dept. of Licensing & Regulation,* 469 S.W.3d 69, 76 (Tex. 2015) (citing *City of Elsa,* 226 S.W.3d at 392). The State may proceed against the County entities.

### B. The State established traceability.

Texas' standing doctrine parallels the familiar federal test for Article III standing—a "plaintiff must allege personal injury fairly traceable to the defendants' allegedly unlawful conduct and likely to be redressed by the requested relief."

*Heckman v. Williamson County,* 369 S.W.3d 137, 155 (Tex. 2012). The State has conclusively proven each element. In fact, the County has already acknowledged the "Supreme Court has held that the State has standing to bring suit to enforce its own laws." CR.114.

The County has challenged only the traceability element of standing. Appellee.Br.33. That makes sense because when government officials choose to violate state laws, that conduct "automatically results in harm to the sovereign as a matter of law." *Hollins,* 620 S.W.3d at 410; *see also Texas Ass'n of Bus. v. City of Austin,* 565 S.W.3d 425, 441 (Tex. App.--Austin 2018, pet. denied). And the State has shown traceability by "seek[ing] relief against the particular government official or agency responsible for the challenged action." *In re Abbott,* 645 S.W.3d 276, 280 (Tex. 2022) (orig. proceeding).

Once the Supreme Court issued the emergency stay relating to Uplift Harris, Harris County Public Health (HCPH) created the Program to "meet the same people … and fulfill the same purpose as Uplift Harris." 2.RR.9:14-24; 2.RR.19:9-12. Once HCPH rolled out its "new" program, the Harris County Commissioners Court voted to launch the Program and amend its prior Uplift Harris agreement with GiveDirectly. 2.RR.24:17-25:10; *see also* 5.RR.84-102. Upon the commissioners' approval, the County Judge executed the contract amendment with GiveDirectly,

15

Inc. to administer the Program. 5.RR.94. Per the terms of the contract, the County, *acting by and through Harris County Public Health,* obligated itself to "award" the Program Fund, 5.RR.92, and "transfer the funds necessary," 5.RR.93. That means that HCPH's executive director, Defendant Leah Barton, and her "agents" "employees," or those "in active concert or participation with them," Tex. R. Civ. P. 683, have the power to direct the Program payments in the future. 2.RR.51:11-52:13. As Mr. Maddox explained, "[W]e're (HCPH) expecting somebody to administer those funds on our behalf ," so HCPH could "ensure that they are able to be paid the next iteration of those funds." *Id.* The State has sought relief against each of the officials and agencies directly responsible for authorizing and implementing the Program in violation of State law. And, as the Program anticipates delivering "$500 a month for 18 months," Appellee.Br.5, the State sought to enjoin the same defendants from continuing to violate state law for at least the next eighteen months. That is prospective conduct. *Contra* Appellee.Br.35. Further indicating the State joined the proper defendants, the same defendants were unable to disburse any Uplift Harris funds after the Supreme Court stayed them from making program payments. *In re State,* 2024 WL 2983176, at *5. In fact, one of the members of Harris County Commissioners Court, Defendant Rodney Ellis, admitted as much when he explained, "We were racing to get at least one payment out the door, but

16

unfortunately we were not able to process them before the Supreme Court order came down." *See* Rodney Ellis (@RodneyEllis), X (April 23, 2024, 1:39 PM), https://x.com/RodneyEllis/sta-tus/17828417448512817292. Nor would the County's Motion to Vacate Injunction, filed January 9, 2025, be necessary if the State had actually sought relief against improper officials. If the same defendants could not make Uplift Harris payments following the Supreme Court's ruling, and still cannot make Program payments following this Court's order, then the State named the proper defendants.

Finally, the County's contention that the State failed to plead traceability in its petition misses the mark. "When either party adduces evidence in connection with a jurisdictional plea, the trial court should consider that evidence in addition to challenges to the pleadings in confirming its jurisdiction." *Fraley v. Tex. A&M Univ. Sys.*, 664 S.W.3d 91, 97 (Tex. 2023). That is what happened here. The county filed a plea to the jurisdiction asserting that the State did not have standing, and the State pointed to evidence that it did. The court may consider the evidence adduced.

## IV. The Program Is Unconstitutional.

What Harris County intended to do, *see* Appellees' Br. 38, is irrelevant because it violated the Texas Constitution's Gift Clauses and Equal Protection Clause. And while the County insists (at 37) that the Court should review the

17

Program "deferential[ly]," the County never has "discretion to violate the law." *13335 Duluth Rest. & Bar, L.L.C. v. Hegar*, No. 14-20-00098-CV, 2021 WL 4314468, at *5 (Tex. App.—Houston [14th Dist.] Sept. 23, 2021, no pet.) (mem. op.). The County cannot shield its Program from review by repeatedly calling it a "policy choice." Appellee.Br.38 (quoting *Borgelt*, 692 S.W.3d at 301); *see also, e.g.*, Appellee.Br. 71.

### A. The Program violates the Gift Clauses.

The Gift Clauses apply here, and the Program does not pass their muster. A "challenged expenditure satisfies" those Clauses when (1) the expenditure is not gratuitous but instead brings a public benefit; (2) the predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party; *and* (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished." *Borgelt v. Austin Firefighters Ass'n,* 692 S.W.3d, 288, 301 (Tex. 2024). The Program fails all three requirements. And no other constitutional provision authorizes the Program.

### 1. The Gift Clauses apply to the Program.

The County errs when it contends (at 39-49) that the Gift Clauses do not apply to the Program, and its discussion of history reinforces rather than undercuts the State's point. On one thing the parties agree: Historically, "overseers of the poor"

administered poor relief, often at the local level. State's Br.4-9; Appellee.Br.44-49. But that localities may have typically overseen poverty-relief efforts merely means that local governments must oversee such relief in accordance with the Constitution, including with appropriate controls. *See* State's Br. 40-45; *see also* Appellee.Br.46 (discussing original article XI, section 2 and article XVI, section 8). The Program does not offer poverty relief constitutionally for the reasons the State has explained. *Infra* 22.

The County's assertion (at 46) that the Texas Constitution's framers would not have understood article III, section 52(a) to address welfare or poverty relief cannot be squared with the fact that around twenty years after their Constitution's ratification, Texans provided (in a later-repealed exception to section 51) for the care of *indigent* and disabled Confederate veterans. Tex. H.J. Res. 34, 25th Leg., R.S., 1897 Tex. Gen. Laws 275, *repealed by* Tex. H.J. Res. 62, 76th Leg., R.S., 1999 Tex. Gen. Laws 6611, 6630); *see Collingsworth County v. Allred*, 40 S.W.2d 13, 15 (Tex. 1931). Neither the addition nor its repeal would have been necessary if governmental entities had already had the "discretion" the County claims to make unfettered "policy decision[s]" regarding relief programs. Appellee.Br.37. And other constitutional provisions excepting certain types of poor relief from the Gift Clauses' general prohibition show that the framers understood that poor relief fell within

those Clauses' ambit. State's Br. 46-52. The County has not contended that those provisions are surplusage. *See Collingsworth County*, 40 S.W.2d at 15; *infra* 29 (explaining why the County cannot ignore those provisions). Accordingly, Legislature demonstrated that it understood that the Constitution permits some poor relief when it authorized commissioners' courts to provide poor relief, Appellee.Br. Tab.17—but that relief must still comport with constitutional limits.

The County insists (at 43-44) that the Gift Clauses' framers did not "raise the issue of poor relief or suggest that" the Clauses "w[ere] designed to prevent" such relief." But the same is true of the subjects of most Gift Clause cases. For example, the Constitution's framers did not debate whether the Gift Clauses would have applied to collective-bargaining agreements, *see Borgelt*, 692 S.W.3d at 299, or to methods of funding workers' compensation, *see Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 379 (Tex. 2002), or to public employees' pensions, *see Byrd v. City of Dallas*, 6 S.W.2d 738, 738 (Tex. [Comm'n Op.] 1928). But the County has not identified any case in which any Texas court has held that the Gift Clauses did not apply merely because no one happened to record any debates on a particular subject matter at the constitutional convention.

The County fares no better with the Clauses' text. To begin, the Clauses' aim is not solely "commercial." *Contra* Appellee.Br.44. Only a single clause in

section 52(a) prohibits local governments from "becom[ing] a stockholder in [a] corporation, association[,] or company." Tex. Const. art. III, § 52(a). Other provisions forbid them from "grant[ing] public money or thing of value in aid of, or to any individual." *Id.* The conjunction "or" separates these provisions, *id.*, and that "disjunctive conjunction . . . signifies a separation between two distinct ideas," *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 581 (Tex. 2000). In other words, the clause that forbids a local government from becoming a stockholder in a corporation does not shed light on the meaning on the prohibition on granting money to individuals.

The County claims (at 45) that the Constitution's framers would have referred to $500 monthly stipends to individuals as "relief," not "aid," and that the Constitution does not bar "relief." But the very dictionary that the County cites defines "aid" as "[h]elp; succor; support; assistance; *relief*." Appellee.Br.Tab.16. The County fares no better (at 45) when it maintains that an expenditure qualifies as a "grant" only if someone requested it. The County has apparently forgotten that recipients of Program funds had to apply and request to be accepted into the program. CR.88, 2.RR.10:22-11:4. And the County cannot explain how a government would have fulfilled any "duty" to provide assistance to the poor without "bestowing benefits" on them. Appellee.Br.44-45 (emphasis omitted).

21

Moreover, to *grant* something just means "[t]o bestow or confer," Appellee.Br.Tab.13—as the County's own authority demonstrates, a request need not precede it, Appellee.Br.Tab.13 (explaining that a "[g]rant" is only "*usually* in answer to [a] petition (emphasis added)). The Gift Clauses would countenance a strange result if they allowed the government to give a robber baron free cash, but only if he didn't ask for it.

### 2. The Program violates the Gift Clauses.
#### a. The Program is gratuitous.

Program payments are a "gratuitous" transfer. *Borgelt*, 692 S.W.3d at 301. The County attempts (at 51-54) to justify only two forms of "return consideration," *Tex. Mun. League*, 74 S.W.3d at 383, that, in the County's view "together" provide sufficient consideration, Appellee.Br.51. This suggests that if one putative form of consideration fails, the County has not satisfied the gratuitousness test. Neither alleged "consideration" prevails.

*First*, the County argues (at 51-52) that it receives return consideration through reducing poverty. But that is the same as saying that a giveaway can itself constitute consideration. That can't be right. *See* Tex. Const. art. III, § 52(a) (forbidding the giving away of money); State's Br. 35. The County's notion (at 52) that participants' sharing account data suffices for consideration fails for the same reason.

22

*Second*, the County contends (at 52) that Program participants give consideration by providing "illuminating data in return" for Program funds. But the "survey of [recipients'] financial status and spending habits" the County references (at 52) is optional. Irrespective of how "valuable" the County considers it, Appellee.Br.52, that information cannot constitute a bargained-for exchange for Program payments when recipients may choose whether to participate.

### b.  The Program does not serve a public purpose.

The Program lacks a predominantly public purpose. *Borgelt*, 692 S.W.3d at 304. While it is true that "[s]ome private benefit will almost inevitably arise from government payments to non-government entities or individuals," *Borgelt*, 691 S.W.3d at 304 (emphasis omitted), the County has not shown that its averred purposes—"reduc[ing] unemployment, reduc[ing] poverty, boost[ing] self-sufficiency[,] and improv[ing] general health and educational outcomes," County.Br.54—are predominantly public.

Reducing poverty cannot, standing alone, satisfy the predominant-public-purpose requirement. As the State has explained (at 38-39), the Constitution allows local governments to pursue certain forms of poverty relief, but not others. The County makes no effort to show why its Program fits within the permissible types of relief.

23

Nor does a public purpose predominate in County's other expressed aims. Purposes like "boost[ing] self-sufficiency" predominantly benefit individuals, not the public. And while "reduc[ing] unemployment" and "improving health and educational outcomes" might count as public purposes, they are not the *Program's* purposes because the Program uses only wealth and location criteria to select its participants. CR.88, 2.RR.10:22-11-4. That "financial assistance" *might* increase employment and lead to "better physical health outcomes," Appellee.Br.55 (quoting 3.RR.7), does not show that the Program sets out to achieve these things directly, *see also* Appellee.Br.57 (explaining that the Program was only "'expected' to achieve" certain goals). At most, such benefits would be "incidental," "indirect[]," and "indefinite." Tex. Att'y Gen. Op. JM-1255, at 9 (1990). But one of the County's claimed purposes will satisfy the Gift Clauses only if it constitutes the Program's "direct goal." *Id.* The County contends (at 55) that "poverty and location-based eligibility criteria were the best way to achieve its purposes," but that insistence does not make the County achieve those purposes any more directly.

Nor does the record support the County's contention (at 57-58) that recovery from a public calamity—here, COVID—is the predominant purpose. *See* Tex. Const. art. III, § 51-1 As the federal government has declared, COVID is over. *See* H.J. Res. 7 (Apr. 14, 2023). Moreover, even if the less fortunate were "most likely

24

to be impacted by the COVID pandemic," Appellee.Br.58, nothing in the Program or its eligibility criteria specifically links to COVID relief.

### 3. Harris County does not retain constitutionally sufficient control over the funds.

The Gift Clauses mandate controls that are "specifically tailored," Tex. Att'y Gen. Op. No. MW-89, at *1 (1979), "to ensure that the public purpose is in fact accomplished," *Borgelt*, 692 S.W.3d at 301. The controls that the County has asserted do not meet this requirement. Perhaps most importantly, the County has no way of ascertaining whether Program participants are spending funds on items beyond "basic needs." County officials have admitted that they cannot see what items participants purchase. 2.RR.55:22-24. This testimony constitutes "evidence" that the County's vaunted "controls" do not work. *See* Appellee.Br.66. While a participant's contract may require the participant to use Program funds "for basic needs, including housing-related expenses, utilities, transportation, groceries, medical care, education, clothing, and *other goods and services*," 5.RR.111, "Harris County won't be able to see what was purchased," 2.RR.55:22-24. The State does not dispute that any Program agreements purport to authorize only certain types of purchases. *See Borgelt*, 692 S.W.3d at 294 (describing limits in a contract between a local government and a public-sector union). But because the Program relies only on the County's lucky, ad hoc guess to inform the County of any forbidden purchases,

the County lacks a way effectively to *enforce* any such agreement. Requiring someone to purchase only certain items does not give "insight into what participants do with the funds" once the participants have them. *Contra* Appellee.Br.64.

The County asks the Court (at 61) to assume that recipients will "comply with these [contractual] requirements," but that says nothing about how the County will learn of any breaches of those requirements. Any remedy, *see* Appellee.Br.63, is toothless if the County is not "aware" of a violation it must remedy. And MCCs cannot prohibit recipients from purchasing items not in compliance with the County's requirements, 2.RR.58:23-66:22, irrespective of how "carefully" the County "generated the list of acceptable MCCs," Appellee.Br.61. After all, the County never claims that an MCC can prevent Program participants from making prohibited purchases at acceptable vendors. *See* Appellee.Br.64.

The County insists that it exercises control on the back end, but those mechanisms cannot prevent expenditures that violate Program requirements. The County notes (at 62, 64) that it can ask Program participants to "provide additional information about their specific purchases." But if the County does not have a way of finding out about forbidden purchases, it is likely to miss out on "information about specific" transactions that run afoul of the contract with the participant. Random audits suffer from the same problem. *See* Appellee.Br.62. Moreover, the

County hasn't even finalized its audit procedures. State's Br. 44. Mere ability to audit, without procedures in place to catch purchases that violate Program terms, does not provide evidence of control over Program funds. The County also contends (at 62) that it "exercises control on the front end: it restricts who may participate to ensure it is effective at achieving its stated goals." Eligibility criteria simply limit *who* will initially receive the County's largesse. Once the funds are in the recipients' hands, Harris County remains unable to identify any specific plan or procedure indicating it would have any further control over the funds.

In short, the County has failed to put controls in place that detect a forbidden purchase once it occurs, and the mechanisms it touts rely on the County's lucky guesswork in picking whom to audit or from whom to request more information. And the ability to detect prohibited purchases once they occur is not optional, *contra* Appellee.Br.65 (insisting that greater control is not "necessary for the Program to be constitutional")—without that ability, the County cannot effectively ensure that Program funds go toward a constitutionally permissible purpose, *see Borgelt*, 692 S.W.3d at 301. If "[e]xercising item-level control 'just isn't feasible for this type of program,'" Appellee.Br.65 (quoting 2.RR.55), then by its nature, the Program is not susceptible to constitutionally sufficient controls and, again by nature, violates the Gift Clauses. The Legislature is not required to "create new mechanisms" to hold

Harris County accountable. *Borgelt*, 692 S.W.3d at 310. That remark in *Borgelt* refers only to the Gift Clauses' "existing framework"—that is, the three-pronged test. *Id.* It does not stand for the proposition that a local government can institute constitutionally insufficient controls because the Legislature has not provided it with specific options for sufficient ones. *Contra* Appellee.Br.65. And whether to control for prohibited purchases is not a "policy decision." *Contra* Appellee.Br.65.

### 4. No other constitutional provision authorizes the Program.

No provision of the Constitution authorizes the County's Program. The County contends (at 67) that "[s]ubsequent enactments do not inform the original meaning" of the Gift Clauses, but the Texas Supreme Court has said otherwise. "The Constitution must be read as a whole, and all amendments thereto must be considered as if every part had been adopted at the same time and as one instrument." *Collingsworth County v. Allred*, 40 S.W.2d 13, 15 (Tex. 1931) (orig. proceeding. In particular, "[d]ifferent sections, amendments, [and] provisions of a Constitution which relate to the same subject[]matter"—as the Gift Clauses and the amendments the State has cited do—"should be construed together and considered in the light of each other." *Id.*

The County misreads *Linden* when it contends that that case confirmed that "'the care of the poor' is a 'strictly government purpose' on which county funds

may be spent." Appellee.Br.68 (quoting *Bexar County v. Linden*, 220 S.W. 761, 763 (Tex. 1920)). No one asked the *Linden* Court to decide that question. In that case, Bexar County's district attorney claimed that a statute violated the Gift Clauses when it provided for "the disposition of" a district attorney's excess fees into the county treasury. *Linden*, 220 S.W. at 761. Thus, the County is wrong (at 67-68) when it claims that *Linden* had nothing to do with the Gift Clauses. Moreover, in that case, the Supreme Court merely mentioned that the State could use counties "for the care of the poor," *id.* at 763—but as the State has explained (at 46-49), any "care of the poor" must conform to constitutional limits.

The County argues (at 68-70) that the "notwithstanding" clause of article III, section 52-a, kicks economic-development programs out of the Gift Clause analysis altogether. The Supreme Court has already expressed skepticism of that notion. *In re State,* 2024 WL 2983176, at *4.

> Under the County's permissive reading, nearly any direct gift of public money that will likely be spent by the recipient could qualify as 'economic development'—on the theory that any boost in overall consumer spending is good for the economy. If this is right, then section 52-a comes close to repealing the Gift Clauses' ban on "gratuitous payments to individuals."

*Id.* (quoting *Tex. Mun. League*, 74 S.W.3d at 383). The canon against surplusage, *see, e.g.*, *Spence v. Fenchler*, 180 S.W. 597, 601 (Tex. 1915), counsels against that reading.

Instead, as the Supreme Court concluded, it is "more likely that by authorizing 'grants of public money for the public purposes of development and diversification of the economy of the state,' section 52-a removed doubt about the constitutionality of conventional economic-development grants." *In re State*, 2024 WL 2983176, at *4 (quoting Tex. Const. art. III, § 52-a). In other words, the economic-development provision "appears designed to clarify that 'development and diversification of the economy of the state' qualify as 'public purposes.'" *Id.* (quoting Tex. Const. art. III, § 52-a). This analysis holds irrespective of whether a program "purposes" to "develop[] and diversif[y]" the State's economy or eliminate "unemployment or underemployment." Tex. Const. art. III, § 52-a. And it is far from clear that the Program counts as a "conventional economic-development grant." *Id.* The County maintains (at 70) that it has "significantly developed" its argument on this score since *In re State*, but the section of its brief discussing section 52-a in this litigation is largely identical to its discussion of that provision in *In re State*. *Compare* Appellee.Br.68-70, *with* Real Parties in Interest's Opposition to Relator's Motion for Temporary Relief 55-57, *In re State*, No. 24-0325 (Tex. Apr. 29, 2024).

## B. The Program violates the Equal Protection Clause.

The Program also runs afoul of Texas's equal-protection guarantee. *See* Tex. Const. art. I, § 3. The County contends (at 71) that "eligible applicants are treated equally" because "each had an equal chance of being selected." But the County's argument ignores that the eligibility criteria—that is, the criteria that the County used to decide whether an individual would participate in the County's lottery in the first place—are themselves arbitrary. "Poor individuals who live within the right zip code or participate in ACCESS Harris County are not rationally distinguished from poor individuals who do not," State's Br. 56, so the Program's selection criteria bear no "real and substantive difference having a relation to the subject of the particular enactment." *Crawford Chevrolet, Inc. v. McLarty,* 519 S.W.2d 656, 661 (Tex. App.—Amarillo 1975, no writ). Again, the County cannot stave off review of an unconstitutional program by calling it a "policy decision[]." Appellee.Br.71 (quoting *Herbert v. Hopkins*, 395 S.W.3d 884, 900 (Tex. App.—Austin 2013, no pet.). The County next maintains (at 71-72) that it "acted rationally in using a limited pool of federal funds in line with federal regulations to achieve multiple rational public purposes." But the Program's selection criteria, not federal regulations, determine whether an individual is eligible for the program. And those have no rational connection to the Program's putative justification. State's Br. 53-56.

## V. The County must inform the Court whether this case or the Uplift Harris case is moot.

During the Uplift Harris litigation, the County insisted on multiple occasions that it "must commit" the federal funds that it uses to fund its unconstitutional program "by December 31, 2024." Real Parties in Interest's Opposition to Relator's Motion for Temporary Relief at 31, *In re State*, No. 24-0325 (Tex. Apr. 29, 2024) (quoting 42 U.S.C. § 803(c)(1)); *accord* Appellees' Opposition to Appellant's Motion for Temporary Relief at 17, *State v. Harris County*, No. 24-00061-CV (Tex. App.—Austin [15th Dist.] Apr. 22, 2024) (same); Real Parties in Interest's Motion to Vacate Administrative Stay at 7, *In re State*, No. 24-0325 (Tex. June 6, 2024) (same). Indeed, the County told the Supreme Court that "Harris County must commit the federal funds . . . dedicated to Uplift Harris by the end of the year"—that is, 2024—"or lose them forever." Opposition to Relator's Motion for Temporary Relief at 2, *In re State*, No. 24-0325 (Tex. Apr. 29, 2024). This putatively looming "commitment" deadline formed part of the basis for the courts to act expeditiously and for the parties to brief the cases speedily because, as Harris County put it, "[b]uilding any other program would take significant time and effort." *E.g.*, Motion to Vacate Administrative Stay at 7, *In re State*, No. 24-0325 (Tex. June 6, 2024). But New Year's Day 2025 has now come and gone, and the County has filed no suggestion in any court regarding which program—Uplift Harris or the

Community Prosperity Program—is now moot. But if the County were correct that it "must commit" federal funds to a program "by December 31, 2024," then one of those programs surely is moot by now. Litigants "are duty bound for as long as they invoke or submit to a court's authority to confirm the presence of jurisdiction and to raise jurisdictional defects." *Rattray v. City of Brownsville,* 662 S.W.3d 860, 867 (Tex. 2023).

## Conclusion and Prayer

The Court should reverse the trial court's Amended Final Judgment and render an injunction prohibiting Defendants from issuing payments under the Harris County Community Prosperity Program.

## Certificate of Compliance

Microsoft Word reports that this document contains 7,407 words, excluding exempted text.

/s/ William H. Farrell
William H. Farrell

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nicole Myette on behalf of William Farrell
Bar No. 796531
nicole.myette@oag.texas.gov
Envelope ID: 96444095
Filing Code Description: Other Brief
Filing Description: 20250121_Aplnt's Reply Brief
Status as of 1/21/2025 4:13 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Yetter Coleman | | efile@yettercoleman.com | 1/21/2025 4:06:27 PM | SENT |
| Edward Swidriski | 24083929 | Edward.Swidriski@harriscountytx.gov | 1/21/2025 4:06:27 PM | SENT |
| Grant Martinez | | gmartinez@yettercoleman.com | 1/21/2025 4:06:27 PM | SENT |
| Lily Hann | | lhann@yettercoleman.com | 1/21/2025 4:06:27 PM | SENT |
| Marisa Mata | | mmata@yettercoleman.com | 1/21/2025 4:06:27 PM | SENT |

Associated Case Party: Harris County, Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher Garza | 24078543 | christopher.garza@harriscountytx.gov | 1/21/2025 4:06:27 PM | SENT |
| Jonathan Fombonne | 24102702 | jonathan.fombonne@harriscountytx.gov | 1/21/2025 4:06:27 PM | SENT |
| Christian Menefee | 24088049 | christian.menefee@harriscountytx.gov | 1/21/2025 4:06:27 PM | SENT |
| Ryan Cooper | 24123649 | ryan.cooper@harriscountytx.gov | 1/21/2025 4:06:27 PM | SENT |
| Andrea Mintzer | | Andrea.Mintzer@harriscountytx.gov | 1/21/2025 4:06:27 PM | SENT |
| Eleanor Matheson | 24131490 | Eleanor.matheson@harriscountytx.gov | 1/21/2025 4:06:27 PM | SENT |

Associated Case Party: The State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| William Farrell | | biff.farrell@oag.texas.gov | 1/21/2025 4:06:27 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 1/21/2025 4:06:27 PM | SENT |